1  DAWN SESTITO (S.B. #214011)
   dsestito@omm.com
2  MATTHEW R. COWAN (S.B. #281114)
   mcowan@omm.com
3  O'MELVENY & MYERS LLP
   400 South Hope Street
4  Los Angeles, California 90071-2899
   Telephone:    (213) 430-6000
5  Facsimile:    (213) 430-6407

6  *Counsel for Defendant Exxon Mobil Corporation*

7

8               **UNITED STATES DISTRICT COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10

11 | THE PEOPLE OF THE STATE OF          | Case No.
   | CALIFORNIA, ex rel. ROB BONTA,
12 | ATTORNEY GENERAL OF CALIFORNIA,     | **NOTICE OF REMOVAL OF CIVIL
   |                                     | ACTION**
13 |              Plaintiffs,

14 |       v.                            | Removed from the Superior Court of the
   |                                     | State of California for the County of
15 | EXXON MOBIL CORPORATION; AND        | Francisco, Case No. CGC-24618323
   | DOES 1 THROUGH 100, INCLUSIVE,
16 |                                     | Action Filed: September 23, 2024
   |              Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

**TO THE CLERK OF THE ABOVE-TITLED COURT AND PLAINTIFFS:**

PLEASE TAKE NOTICE THAT, pursuant to 28 U.S.C. §§ 1331, 1333, 1441 and 1442, Defendant Exxon Mobil Corporation ("ExxonMobil") hereby removes to this Court—with reservation of all defenses and rights—the state court action described below:[1]

## I.    INTRODUCTION

1.    The California Attorney General's lawsuit seeks to blame ExxonMobil for purportedly causing what he asserts is "one of the most devastating global environmental crises of our time: the plastic waste and pollution crisis." Compl. ¶ 1.  With no apparent sense of irony, his complaint alleges that ExxonMobil caused this problem by "promoting" recycling, even though California itself has promoted the recycling of plastics for decades.  Even today, California says it is "addressing plastic waste" by "invest[ing] and expand[ing] domestic recycling."  *See* https://calrecycle.ca.gov/Plastics/.  California has dozens of laws that encourage the recycling of plastics, including a 1989 law that Plaintiff says "required" cities in California "to design and implement curbside recycling programs that required mandatory participation by all residents." Compl. ¶ 399.[2]

2.    ExxonMobil files this Notice of Removal from the San Francisco County Superior Court to the United States District Court for the Northern District of California, invoking jurisdiction under 28 U.S.C. §§ 1331, 1333, 1441, and 1442.

---

[1] In filing this Notice of Removal, ExxonMobil does not waive, and expressly preserves, its right to challenge personal jurisdiction with respect to this action.  *See, e.g., Carter v. Bldg. Material & Constr. Teamsters' Union Local 216*, 928 F. Supp. 997, 1000-01 (N.D. Cal. 1996) ("A petition for removal affects only the forum in which the action will be heard; it does not affect personal jurisdiction.").

[2] *See, e.g.*, AB 793 (2020 law establishing plastic recycling standards); AB 827 (2019 Customer Access to Recycling law for businesses); AB 341 (2012 law mandating commercial recycling).  Historically, California told the public that plastic "can be recycled into clothing, fiberfill for sleeping bags, stuffed animals, toys, rulers, and more!"  Cal. Dep't. of Conserv. Div. of Recycling, Recycling Facts, Games and Crafts, at 19, (Dec. 23, 2005), available at https://web.archive.org/web/2005122311 0234/http:/www.consrv.ca.gov/DOR/rre/kids/Ed_Images/images/FactsGamesCrafts02.pdf.

3.      Venue is proper in this Court because it is the "district court of the United States for the district and division embracing the place where [the] action is pending."  28 U.S.C. § 1441(a).

## II.    TIMELINESS OF REMOVAL

4.      On September 23, 2024, Plaintiffs filed this lawsuit in the Superior Court of the State of California for the County of San Francisco, Case No. CGC-24618323, captioned *The People of the State of California v. ExxonMobil Corporation*.  ExxonMobil was served on October 4, 2024.  A true and correct copy of all "process, pleadings, and orders" served upon ExxonMobil is attached as **Exhibit 1** to the concurrently filed Declaration of Dawn Sestito.  28 U.S.C. § 1446(a).

5.      ExxonMobil's notice of removal is timely because it is filed fewer than 30 days after service.  28 U.S.C. § 1446(b).

## III.    SUMMARY OF ALLEGATIONS

6.      This lawsuit seeks to hold ExxonMobil liable for allegedly creating the "the plastic waste and pollution crisis."  Compl. ¶ 1.  According to Plaintiffs, ExxonMobil "ramped up plastic production and deceptively promoted recycling as a cure-all for plastic waste" even though it allegedly "knew that the consequent amount of plastic waste would continue to rise, inevitably leading to ever-increasing plastic pollution."  *Id*. ¶ 3.

## IV.    THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER

7.      Under 28 U.S.C. § 1441(a), "civil action[s] brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to federal district court" in the "the district and division embracing the place where such action is pending."  *Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 679-80 & n.4 (9th Cir. 2006); 28 U.S.C. § 1441(a).[3]  All elements required for removal under Section 1441 are satisfied here.  The Court has original maritime jurisdiction under Section 1333, and original

---

[3] Unless otherwise noted, all emphases are added, internal citations, quotation marks, and alterations are omitted.

1    "arising under" federal question jurisdiction, pursuant to the federal enclave doctrine, 28 U.S.C.

2    § 1331.

3        8.    Section 1442(a)(1) also permits of any civil action "against or directed to … [t]he

4    United States or any agency thereof or any officer (or **any person acting under that officer**) of

5    the United States or of any agency thereof, in an official or individual capacity, for or relating to

6    any act under color of such office." 28 U.S.C. § 1442(a)(1). All elements of Section 1442(a)

7    removal are likewise satisfied.

8        9.    ExxonMobil's notice of removal is timely. *See supra* ¶ 5.

9        10.    This Court is the proper venue for the removed action. A civil action "may be

10   removed … to the district court of the United States for the district and division embracing the

11   place where such action is pending." 28 U.S.C. § 1441(a). The United States District Court for

12   the Northern District of California embraces San Francisco County. 28 U.S.C. § 84(a). The San

13   Francisco Division is the proper intradistrict assignment under Civil Local Rule 3-2(d) and

14   General Order 44.

15       **A.    This Court Has Original Jurisdiction Under Section 1333**

16       11.    This Court has original admiralty or maritime jurisdiction under 28 U.S.C. § 1333.

17   "Tort claims may sound in admiralty jurisdiction if they satisfy a test … showing that the claim

18   has the requisite maritime flavor" by establishing the following "three components": "The

19   relevant tort or harm must have (1) taken place on navigable water (or a vessel on navigable water

20   having caused an injury on land)" (the "location test"), (2) "a potentially disruptive impact on

21   maritime commerce, and (3) a substantial relationship to traditional maritime activity" (together

22   with (2), the "nexus" or "connection" test). *Ali v. Rogers*, 780 F.3d 1229, 1235 (9th Cir. 2015); *In*

23   *re Blue Water Boating, Inc.*, 786 F. App'x 703, 704 (9th Cir. 2019); *In re Mission Bay Jet Sports,*

24   *LLC*, 570 F.3d 1124, 1126 (9th Cir. 2009). Plaintiffs' allegations satisfy all three elements of

25   original admiralty jurisdiction under Section 1333.

26       12.    **The location test is satisfied.** The location test is satisfied because the alleged

27   wrongs "occurred on navigable water." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock*

28   *Co.*, 513 U.S. 527, 534 (1995). The location test turns on the "situs" of the tort, meaning "the

4

place where the injury occurs" or "takes effect"—not where the allegedly injurious conduct occurred. *Taghadomi v. United States*, 401 F.3d 1080, 1084 (9th Cir. 2005). Accordingly, "the first prong of the test for admiralty jurisdiction … simply require[es] that 'the injury occur on [navigable] water.'" *Id*. at 1084 n.6. And waters qualify as "navigable when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." *In re Garrett*, 981 F.3d 739, 741 (9th Cir. 2020).

13.    Here, Plaintiff alleges an injury that "occur[red] on navigable waters" for purposes of the "location test." *Id*. The "situs" of the alleged injury—i.e., "where the nuisance exists," *People v. Selby Smelting & Lead Co.*, 163 Cal. 84, 95 (1912)—essentially encompasses all of California's "waterways." Compl. ¶¶ 3, 6. That includes not only the coastal waters of the Pacific Ocean, but also California's "rivers, lakes, [and] bays." Compl. ¶ 360 (specifically alleging harm in, *inter alia*, "Monterey Bay National Marine Sanctuary and the Bodega Bay State Marine Reserve"); *see also, e.g.*, Compl. ¶ 3 (plastic pollution "harming California's iconic coastlines, waterways, wildlife, and residents"); *id*. ¶ 60 ("Plastic pollution is proliferating in oceans, seas, rivers and lakes, accumulating at or near the surface, on lake and ocean bottoms, and along riverbanks and shorelines."); *id*. ¶ 65 (plastic pollution in the Pacific Ocean); *id*. ¶ 66 ("Plastic waste visibly pollutes California's beaches, rivers, waterways and marine environments, fouls recreational areas, and threatens marine life and sensitive habitats and ecosystems."). Indeed, the word "marine" alone is used 87 times in the Complaint.

14.    These California waterways, the situs of the alleged harm, are "neither enclosed nor obstructed," but rather remain "accessible for trade or travel," both interstate and international. *Mission Bay*, 570 F.3d at 1127 ("the rest of Mission Bay [besides "reserved area"], as well as the Pacific Ocean" qualify as navigable). That means the allegedly harmed waterways in California indisputably include "navigable waters." *Id*. The location test is satisfied.

15.    In addition, the situs of the harm is "navigable waters," satisfying the location test, even for the harms Plaintiff alleges initially arise from land-based plastic pollution, such as

1  "contamination" caused "[a]s plastic waste degrades in landfills." Compl. ¶ 68. The alleged

2  ultimate situs of the alleged harm is still navigable waters, as the alleged injury is only completed

3  after "contamination of soil, groundwater, and surface water by air and by leachate" of plastics in

4  landfills. *Id.*

5        16.   **The Nexus Test.** Both components of the nexus test are satisfied, too—(2) the

6  alleged "tort has the potential to disrupt maritime commerce," and (3) it bears "a substantial

7  relationship to traditional maritime activity." *Mission Bay*, 570 F.3d at 1128.

8        17.   ***Impact on Maritime Commerce.*** To start, the alleged torts have a "potentially

9  disruptive impact on maritime commerce." *Grubart*, 513 U.S. at 534. The Ninth Circuit "[h]as

10  taken an inclusive view of what general features of an incident have a potentially disruptive effect

11  on maritime commerce." *Mission Bay*, 570 F.3d at 1128. The test is satisfied as long as the

12  alleged conduct "could hypothetically have an effect on maritime commerce. It does not require

13  that any impact actually occurred." *Christensen v. Georgia-Pac. Corp.*, 279 F.3d 807, 815 n.31

14  (9th Cir. 2002).

15        18.   The maritime-commerce-impact test is easily satisfied here. Plaintiff explicitly

16  alleges an actual, existing disruptive impact on maritime commerce. According to the Complaint,

17  for example, plastic pollution "affects a substantial number of people who use California

18  waterways for commercial and recreational purposes." Compl. ¶ 374; *id.* ¶ 390-91 ("[P]lastic

19  waste and pollution "interfere with California's commercial and recreational fishing and boat

20  navigation" and "negatively impacts fish populations that California's fishing economy depends

21  upon."). That direct alleged disruption bears a much closer nexus to commercial maritime

22  activity, including fishing, than other conduct the Ninth Circuit has sufficient to establish

23  jurisdiction. *See Mission Bay*, 570 F.3d at 1128-29 (collecting examples, including "cruise ship's

24  treatment of passengers generally," an assault that "depriv[ed] [a] vessel of a [single] deckhand,"

25  and a negligent search-and-rescue).

26        19.   ***Substantial maritime relationship.*** Finally, the alleged conduct Plaintiff

27  challenges bears a "substantial relationship to traditional maritime activity." *Grubart*, 513 U.S. at

28  534. The "substantial relationship" aspect of the "nexus" test is likewise "interpreted broadly."

1  *Tobar v. United States*, 639 F.3d 1191, 1198 (9th Cir. 2011); *see also Sisson v. Ruby*, 497 U.S.

2  358, 367 (1990) (describing "broad perspective demanded by the second aspect of the [nexus]

3  test"). Courts define "the relevant 'activity' … not by the particular circumstances of the

4  incident, but by the general conduct from which the incident arose." *Sisson*, 497 U.S. at 364; *see*

5  *also Ali*, 780 F.3d at 1235 ("We look at a tort claim's general features, rather than at its minute

6  particulars, to assess whether there is the requisite connection.").

7       20.     The substantial relationship analysis proceeds in two steps. "[A]s a first step,"

8  courts "define what constitutes the activity giving rise to the incident." *Gruver v. Lesman*

9  *Fisheries Inc.*, 489 F.3d 978, 983 (9th Cir. 2007). "The relevant activity is not merely the event

10 immediately surrounding the injury[, but] the behavior of any putative tortfeasor that is an

11 arguably proximate cause of the injury." *Id.* at 985. Then, "[h]aving identified the relevant

12 activity, [the] next task is to determine how broadly or narrowly to characterize the [relevant]

13 dispute for the purposes of the comparison to traditional maritime activity." *Id.* Here, both steps

14 lead to the conclusion that ExxonMobil's alleged activity bears a sufficient connection to

15 "traditional maritime activity" to support jurisdiction.

16      21.     Start with the first step—identifying the relevant activity. Plaintiff has alleged that

17 ExxonMobil's conduct "permitted to pass into the waters of the State [a] substance or materials

18 deleterious to fish, plant life, mammals, or bird life"—namely, "plastic waste." Compl. ¶¶ 450,

19 453-54. Plaintiff also alleges that ExxonMobil "created, caused, contributed to, and assisted in

20 creating harmful plastic pollution throughout California, which threatens and harms the

21 environment, wildlife, and communities." *Id.* at ¶ 426-27. Put simply, Plaintiff alleges that

22 ExxonMobil's conduct amounts to polluting California's environment and waterways—including

23 "navigable waters"—through its production of plastic resin and allegedly "decepti[ve]"

24 statements. *E.g.*, Compl. ¶ 389.

25      22.     At the second step, taking an appropriately generalized view of this alleged

26 conduct, ExxonMobil's alleged pollution of California's waterways is also sufficiently "related to

27 activity traditionally subject to admiralty law" to justify admiralty jurisdiction. *Gruver*, 489 F.3d

28 at 983. Courts have long held that "pollution in navigable waters" constitutes a "maritime

tort." *United States v. City of Redwood City*, 640 F.2d 963, 969 (9th Cir. 1981) (oil pollution) (collecting cases); *In re Exxon Valdez*, 767 F. Supp. 1509, 1512 (D. Alaska 1991) ("Oil spills from vessels on navigable waters have consistently been held to be maritime torts by other courts." (collecting cases)); *Puerto Rico v. The M/V EMILY S.*, 1998 WL 938585, at *1 (D.P.R. July 28, 1998) (same); *In re Oswego Barge Corp.*, 664 F.2d 327, 334 (2d Cir. 1981); *Kohlasch v. New York State Thruway Auth.*, 460 F. Supp. 956, 962 (S.D.N.Y. 1978) (allegations that "drain" constructed by transit authority drain causing polluting "discharge" into navigable water supported admiralty jurisdiction). In other words, alleged pollution of navigable water, like Plaintiff alleges here, constitutes "activity traditionally subject to admiralty law [such] that the reasons for applying special admiralty rules would apply …." *Gruver*, 489 F.3d at 983; *Blue Water*, 786 F. App'x at 704-05. Those "specialized rules and technical concepts" apply no less to the marine plastic pollution Plaintiff alleges than to oil pollution to the same navigable waters. Plaintiff's navigable-water-pollution allegations thus connect substantially to the traditional maritime activity for jurisdictional purposes.

23.    ExxonMobil's alleged conduct also includes manufacturing and selling too much plastic. *E.g.*, Compl. ¶ 80. Plaintiff repeatedly alleges that ExxonMobil's over-production of plastic polymers has resulted in "exporting massive amounts of plastic waste to China" and other countries—conduct likewise inherently connected to shipping on maritime vessels. Compl. ¶ 85; *id.* ¶¶ 158, 212 (describing "plastic waste exports" to "China and developing countries"), 227-228. Plaintiff further alleges over-production of plastic has caused harm to "boat navigation," *id.* ¶ 390; and to "California's fishing economy," *id.* ¶ 391, including "several vast swirling gyres of floating plastic pieces dispersed over a huge surface of the Pacific Ocean and throughout the upper portion of the ocean column." *Id.* ¶ 65.

24.    This conduct, too, bears a substantial connection to traditional maritime activity— including shipping, boating, and fishing on maritime vessels. *See Mission Bay*, 570 F.3d at 1130 ("operation of a vessel in navigable waters"); *Blue Water*, 786 F. App'x at 704 ("Although the case law often associates traditional maritime activity with activity involving vessels, neither 28 U.S.C. § 1333 nor the maritime nexus test expressly require the involvement of a vessel.").

**B.    This Court Has Original Jurisdiction Under Section 1331**

25.    Section 1331 provides "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"—that is, "when a federal question appears on the face of the complaint." *Whyte Monkee Prods. LLC v. Netflix, Inc.*, 2024 WL 1645455, at *2 (N.D. Cal. Apr. 16, 2024).  Here, the federal enclave doctrine provides "arising under" federal question jurisdiction over Plaintiff's claims..

26.    **Federal enclave jurisdiction.**  "Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'" *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006).  "[F]ederal law applies in federal enclaves," and "[c]ourts have interpreted this principle to mean that unless an exception applies, any conduct on a federal enclave is governed by federal law." *Burnes v. Parks at Monterey Bay*, 713 F. Supp. 3d 616, 620 (N.D. Cal. 2024); U.S. Const. art. I, § 8, cl. 17 ("Congress shall have Power ... [t]o exercise exclusive Legislation ... [and] like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.").

27.    For federal enclave jurisdiction, "[a] claim must allege that an injury occurred on a federal enclave or that an injury stemmed from conduct on a federal enclave," and "the connection between injuries and conduct must not be too attenuated and remote." *City & Cnty. of Honolulu v. Sunoco LP,* 39 F.4th 1101, 1111 (9th Cir. 2022).  Thus, if tortious conduct caused injury that "occurred on" a federal enclave, then "enclave jurisdiction is proper." *Willis v. Craig*, 555 F.2d 724, 726 (9th Cir. 1977); *see also Sparling v. Doyle*, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014) ("key factor" for federal enclave jurisdiction "is the location of the plaintiff's injury or where the specific cause of action arose."); *Bell v. Arvin Meritor, Inc.*, 2012 WL 1110001, at *2 (N.D. Cal. Apr. 2, 2012) ("Personal injury actions which arise from incidents occurring in federal enclaves may be removed to federal district court as a part of federal question jurisdiction.").  As long as "at least some of the[] locations" where the tortious harm occurred are "federal enclaves," that suffices to support federal question jurisdiction. *Bell*, 2012 WL 1110001, at *2.

28.     A federal enclave "is created when a state cedes jurisdiction over land within its borders to the federal government and Congress accepts that cession. These enclaves include numerous military bases, federal facilities, and even some national forests and parks." *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1235 (10th Cir. 2012); *Azhocar v. Coastal Marine Servs., Inc.*, 2013 WL 2177784, at *1 (S.D. Cal. May 20, 2013) (same). "The central principle of federal enclave doctrine is that Congress has exclusive legislative authority over these enclaves." *Allison*, 689 F.3d at 1237.

29.     Here, the situs of much of the alleged harm is California's waterways—including oceans, rivers, lakes, and bays. *See supra* ¶ 13; Compl. ¶¶ 3, 6, 360. And abutting those waterways, along many of their coasts, are a litany of federal enclaves within California: the Presidio in San Francisco, the Golden Gate National Recreation Area, Naval Air Station North Island, Point Mugu Naval Air Weapons Station, Camp Pendleton, Vandenburg Air Force Base, and numerous other federal facilities and national park areas. *See, e.g.*, *Totah v. Bies*, 2011 WL 1324471, at *2 (N.D. Cal. Apr. 6, 2011) (claim arose in Presidio in San Francisco, a federal enclave); *Azhocar*, 2013 WL 2177784, at *1 ("[Federal] enclaves include 'numerous military bases'"). The Complaint, for example, alleges the Monterey Bay National Marine Sanctuary as the situs of harm—waters designated for special protection by the U.S. Secretary of Commerce under the National Marine Sanctuaries Act, 16 U.S.C. 1431 *et seq.* Compl. ¶ 360.

30.     Plaintiff's claim inherently thus arose on numerous federal enclaves across California. And Plaintiff's "[f]ailure to indicate the federal enclave status and location of the exposure will not shield [it] from the consequences of this federal enclave status." *Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992). Plaintiff's claims arise under federal law.

**C.     This Court Has Removal Jurisdiction Under Section 1442**

31.     The Federal Officer Removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). Courts give Section 1442 "a generous and liberal' construction, interpreting the statute broadly in favor of

removal." *DeFiore v. SOC, LLC*, 85 F.4th 546, 553 (9th Cir. 2023).  The purpose of the statute is to "protect[] the government's agents." *Id.* at 555.

32.     A party seeking removal under section 1442 must show that:  (1) it is a "person" within the meaning of the statute; (2) plaintiff's claims are "for or relating to" an act under color of federal office (i.e, "causal nexus"); and (3) it raises a colorable federal defense.  *In re Commonwealth's Motion to Appoint Counsel*, 790 F.3d 457, 466 (3d Cir. 2015) ("*Philadelphia*"); *Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017).

33.     All three elements are satisfied.

### 1.     ExxonMobil is a "person."

34.     ExxonMobil is a corporation (Compl. ¶ 9), and a corporation is a "person" within the meaning of Section 1442.  *See Leite v. Crane Co.*, 749 F.3d 1117, 1122 n.4 (9th Cir. 2014).

### 2.     Plaintiff's claims relate to an act under color of federal office.

35.     The second element of jurisdiction under Section 1442 asks whether the claims against a private person relate to conduct "fall[ing] within the scope of the statutory phrase 'acting under' a federal 'official.'"  *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 153 (2007).  That requires the removing party to establish a "causal nexus" to actions performed "under federal officers*."  Goncalves*, 865 F.3d at 1244.  The "causal nexus" test thus has two components: (1) "actions under" a federal officer and (2) that are "causally connected"—that is, "relate to"—plaintiff's claims.  *Id.*; *Philadelphia*, 790 F.3d at 472.  Both components are satisfied here.

36.     First, ExxonMobil "acted under" a federal officer because the government exerted the requisite "subjection, guidance, or control" over ExxonMobil's actions as a wartime synthetic rubber producer, and because ExxonMobil engaged in "an effort to assist, or to help carry out, the duties or tasks of the federal superior."  *Goncalves*, 865 F.3d at 1244; *Watson*, 551 U.S. at 152.

37.     Second, assuming the truth of Plaintiff's allegations, ExxonMobil's alleged actions, taken under a federal officer's direction, sufficiently connect and relate to Plaintiff's claims arising out of plastic pollution.  *Goncalves*, 865 F.3d at 1245.  As described in more detail below, the synthetic rubber industry was developed under the control and direction of the federal

government during World War II. Pursuant to that control and direction and as an agent for the federal government, ExxonMobil's predecessor companies constructed and operated butyl and butadiene plants that manufactured chemical compounds used to make tires (and other products) for the war effort. This lawsuit targets all manner of plastic waste, and synthetic rubber tires are allegedly a source of, and contributor to, plastic pollution (which, according to the Complaint, ExxonMobil uses as a feedstock in its advanced recycling operations), Compl. ¶ 271 ¶ n.125. And such tires were used in various military and other applications in California during World in the environment within and outside of California, is thus connected or associated with those actions taken under a federal officer's direction. Compl. ¶¶ 3, 70-74.

### a. ExxonMobil "acted under" federal officials as a participant in the synthetic rubber industry.

38. ExxonMobil "acted under" federal officials for Section 1442 purposes as a participant in wartime synthetic-rubber manufacturing.

39. The Supreme Court has emphasized that Section 1442 must be "liberally construed" and, in particular, "[t]he words 'acting under' are broad." *Watson*, 551 U.S. at 147. "For a private entity to be 'acting under' a federal officer, the private entity must be involved in 'an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" *Goncalves*, 865 F.3d at 1245. The relationship typically involves subjection, guidance, or control, but it must go beyond simply complying with the law, even if the laws are highly detailed and thus leave the entity highly regulated." *Id.*

40. ExxonMobil's World War II participation in the synthetic rubber industry occurred at the "subjection, guidance, or control" of the government. *Id.*

41. **Government Control of Synthetic Rubber Industry During WWII.** "Synthetic rubber was . . . critical to the war effort. After Pearl Harbor, the United States was cut off from 90 percent of the world's natural rubber supplies. The government designated rubber as a critical and strategic material, creating the U.S. Rubber Reserve Company to draw on industry expertise to develop synthetic rubber production." *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486, 496 (S.D. Texas 2015).

42.      Under the direction and control of the federal government during the war years, the synthetic rubber industry developed exponentially faster than it could have in the hands of private industry alone.  During the war, the United States' supply of synthetic rubber increased a hundredfold, from 8,383 long tons in 1941 to 830,780 long tons in 1945.  Ex. 2 at 52.[4]  In 1941, 99% of the rubber consumed in the United States was natural, whereas only 1% was from synthetic sources; by 1945, however, 15% of the rubber was natural, whereas 85% was from synthetic sources.  Ex. 3 at 8.

43.      As the United States Attorney General found:  "From a meager production of 8,000 long tons of synthetic rubber in 1941, the fledgling industry had grown, by the end of 1944, to an industrial mechanism capable of producing more than a million long tons of rubber annually.  In the short span of three years the Government, under the stress of a war emergency, lifted synthetic rubber technology from the test tube of the laboratory and transformed it into a full-blown industry.  This transition from laboratory to commercial production was an industrial and scientific achievement, the result of the joint efforts of Government and private industry.  Under normal circumstances this transition would probably have required several decades or more to accomplish."  Ex. 4 at 1.

44.      The President designated rubber as a strategic and critical material on June 28, 1940.  The Reconstruction Finance Corporation ("RFC"), a financial institution established under the Reconstruction Finance Corporation Act of 1932, formed the Rubber Reserve Company ("RRC") on the same day.[5]  The RRC's "original purpose" was to:

> [B]uy and accumulate a stockpile of natural rubber as a safeguard against possible war in the Far East.  The later activities of Rubber Reserve Company…[were] predominantly concerned with the Government's synthetic rubber program.  These

---

[4] Citations to "Ex." refer to the concurrently filed declaration of Dawn Sestito.
[5] The RFC was an independent federal agency whose wartime mission included: to "engage in financing of plant conversion and construction, to acquire and construct and to own and operate war plant facilities, to make subsidy payments, [and] to deal in and to stockpile strategic and critical materials."  Ex. 5 at 3, 18, 30.  To effectuate this mission, the RFC created a number of subsidiary corporations, including, but not limited to the RRC, which managed the country's synthetic rubber program, and the Defense Plant Corporation (DPC), which constructed and equipped new industrial plants and/or expanded or converted existing plants to war production. Ex. 6; Ex. 7.

activities [were] of a unique character in comparison with activities of other Government agencies and even other RFC corporations in that Rubber Reserve Company [had] the direct responsibility for the formulation, correlation and operation of a program enveloping a new industry of great magnitude from the date of its inception.

Ex. 8 at 5; Ex. 2 at 9; Ex. 7.

45.    In order to address the rubber shortage, on August 6, 1942, President Roosevelt appointed a Rubber Survey Committee (also known as the Baruch Committee, after its chairman Bernard Baruch) to investigate.  On September 10, 1942, the Committee issued a report that characterized rubber, among "all critical and strategic materials," as:

> ***the one which presents the greatest threat to the safety of our nation and the success of the Allied cause***.  Production of steel, copper, aluminum, alloys or aviation gasoline may be inadequate to prosecute the war as rapidly and effectively as we could wish, but at the worst we still are assured of sufficient supplies of these items to operate our armed forces on a very powerful scale.  But if we fail to secure quickly a large new rubber supply our war effort and our domestic economy both will collapse. ***Thus the rubber situation gives rise to our most critical problem***.

Ex. 9 at 23.

46.    The Committee's report further noted that the United States' current rubber situation was "so dangerous that unless corrective measures are taken immediately this country will face both a military and a civilian collapse."  Accordingly, the Committee recommended that the government's "first duty" should be the "maintenance of a rubber reserve that will keep our armed forces fighting and our essential civilian wheels turning.  This can best be done by 'bulling through' the present gigantic synthetic program and by safeguarding jealously every ounce of rubber in the country."  Ex. 9 at 5-6.

47.    The Committee also recommended that President Roosevelt create an Office of the Rubber Director within the War Production Board (WPB) and grant the office the authority to control all aspects of the rubber program.  Ex. 9 at 6.  On September 17, 1942, President Roosevelt enacted this recommendation by issuing Executive Order 9246, which created the Office of Rubber Director, and which "authorized and directed" the Chairman of the WPB " to assume full responsibility for and control over the Nation's rubber program in all of its phases,

14

including, but not limited to: technical research and development, importation, purchase, sale, acquisition, storage, transportation, provision of facilities, conservation, production, manufacturing, processing, marketing, distribution, and use of natural and synthetic rubber, related materials, and products manufactured therefrom."[6]

48.    The Office of the Rubber Director existed for two years.  By July 1944,  the United States' synthetic rubber program was deemed to be fully operational and providing an ample supply of rubber.

49.    During the war, the federal government constructed and owned 51 plants involved in the synthetic rubber program.  Ex. 10.  As noted by the RRC, these plants were constructed "under the auspices" of the federal government's Defense Plant Corporation and "at the request" of the RRC.  Ex. 8 at 47.  The government's construction of the 51 government-owned synthetic rubber plants represented a "capital outlay by the Government of almost $700 million."  Ex. 4 at 1.

50.    Following the war, the United States began the process of selling the government-owned rubber plants to private industry, while simultaneously insuring that they continued to produce sufficient synthetic rubber for military and civilian needs.  Many plans were proposed to dispose of the government-owned plants.  Ultimately, in August 1953, President Eisenhower signed into law the Rubber Producing Facilities Disposal Act of 1953.  This law required that government to obtain full fair value for the plants while providing both for national security and a competitive synthetic rubber market.  Sale of the plants was completed in April and May 1955.

51.    **Wartime Synthetic Rubber Program Operations and Production.**  The RRC determined around 1941 that five major types of plants for the production of buna-S, butadiene, styrene, butyl, and neoprene were required.  Of these types, the largest ones (by volume) were ***butadiene and butyl rubber***, including:

- **GR-S**.  ("Government Rubber-Styrene).  Synthetic rubber of the butadiene-styrene-copolymer type.

---

[6] Executive Order 9246, "Providing for the Coordination and Control of the Rubber Program," 7 Fed. Reg. 7379 (September 19, 1942).

NOTICE OF REMOVAL OF CIVIL ACTION

     ○  GR-S rubber was also known by its German name (Buna-S) and was a general purpose rubber used in the manufacture of tires.

- **GR-I** ("Government Rubber-Isobutylene). Synthetic rubber of butyl rubber type.
- **GR-M** ("Government Rubber-Monovinylacetylene). Synthetic rubber of the neoprene type.
- **GR-A** ("Government Rubber-Acrylonitrile). Synthetic rubber of the butadiene-acrylonitirle-copolymer type.
- **GR-P** ("Government Rubber-Polysulfide). Synthetic rubber of the polysulfide type

Ex. 8 at 48; Ex. 4 at 1.

**Synthetic Rubber Production in Government-Owned Plants, 1942-1945**

| Synthetic Rubber Type | Annual Production in Tons | | | |
|---|---|---|---|---|
| | 1942 | 1943 | 1944 | 1945 |
| GR-S (Butadiene-Styrene) | 2,241 | 181,470 | 668,879 | 717,688 |
| | | | | |
| GR-I (Butyl) | 0 | 1,781 | 18,890 | 47,868 |
| GR-M (Neoprene) | 1,350 | 24,611 | 47,302 | 36,332 |
| GR-A (Acrylonitrile) | 0 | 0 | 2,060 | 33 |
| GR-P (Polysulfide) | 8 | 750 | 0 | 0 |
| **Annual Totals** | **3,599** | **208,612** | **737,131** | **801,921** |

Ex. 2 at 51.

52.    **GR-S Rubber (Butadiene).** Butadiene was the most critical raw material in Buna S [GR-S] rubber, which was made from the copolymerization of butadiene and styrene and was the most common general use synthetic rubber of World War II. Thus, one of the RRC's chief wartime goals was to secure adequate supplies of both butadiene and styrene. To meet demand for GR-S rubber and butadiene, the federal government constructed 15 GR-S plants during World War II, including GR-S facilities at the Baton Rouge and Baytown refineries (discussed below). *See* Ex. 8 at 23-25.

53.    **GR-I Rubber (Butyl Rubber)**. Butyl rubber, known during World War II as GR-I (Government Rubber-Isobutylene), is manufactured from two petroleum products: isobutylene

16

and isoprene.  During World War II, butyl rubber was used for "exclusive military uses" and essential civilian requirements, including tire inner tubes, gas masks, and barrage balloons (large balloons used to deter enemy airplanes) for the war effort.  In July 1945, the RRC estimated that approximately two-thirds of the total domestic consumption of butyl rubber was for military purposes.  *See* Ex. 11.

54.     At first, no butyl plants existed; butyl and the other chemicals were not yet commercially available.  In order to achieve necessary wartime production of butyl rubber, the federal government thus constructed two government-owned butyl plants at refineries operated by ExxonMobil predecessor entities: the Standard Oil of Louisiana ("SOLA") refinery in Baton Rouge, Louisiana, and (2) the Humble Oil and Refining Company ("Humble") refinery in Baytown, Texas, and purchased the entirety of the output from these plants.  Ex. 4 at 21.

55.     These were the only two butyl plants in the United States during World War II.  The federal government also constructed and then owned and controlled several butadiene and other chemical plants (at Baytown and Baton Rouge (operated by ExxonMobil predecessors) and elsewhere) to allow the production of synthetic rubber.  Ex. 4 at 21.  Butyl and butadiene were used to make tires, among other things.

56.     **The Role of Baytown Facility**.  On May 18, 1942, Humble contracted as agent for the DPC (an RFC subsidiary corporation) to construct a synthetic rubber plant to produce butyl rubber.  Ex. 12.  The 58-acre property on which the plant was constructed was located adjacent to the Baytown refinery and was owned by the government.  Ex. 13.  This plant was operated by Humble Oil as a lessee of the DPC to produce butyl rubber.  Ex. 12.  Initial production began on September 9, 1944.  The plant remained in operation throughout WWII and the Korean Conflict and was sold by the government to Humble Oil on April 28, 1955.  It produced hundreds of thousands of long tons of butyl rubber during the period of federal government ownership.  The butadiene plant was similarly constructed and owned by the government.

57.     The federal government had day-to-day involvement in operational decisions.  For example, in January 1946, Humble submitted a post-WWII request to the RRC to grant Humble authorization to install a pump and tank truck loading facilities at the butyl rubber plant.  The

1  pump and facilities requested by Humble replaced a manual skimming operation and was

2  estimated to cost $1,700.  The RRC ultimately approved the request.  Ex. 14.

3      58.    In July 1947, Humble requested authorization to construct a concrete drainage

4  ditch near the ammonia compressor at the butadiene plant, for $1100.  Humble stated that:  "Prior

5  to the installation of this drainage trench, the area adjacent to and north of the ammonia

6  compressor house was inadequately drained and stayed continually wet … It was particularly

7  undesirable since daily washing of the compressor house floor left an accumulation of oily scum

8  along the north side of the building…. Through the use of the concrete trench and a high pressure

9  water hose, the compressor house floor washdown is now routed into a nearby manhole…. This

10  work was tentatively estimated to cost less than $1000 and the work was performed with local

11  approval on Mechanical Order No. 615."  Ex. 13.

12      59.    **The Role of Baton Rouge Facility**.  At the SOLA  refinery in Baton Rouge, the

13  government-constructed and government-owned butyl rubber plant was known as Plancor 572

14  (also known as RuR SR-15).  This plant was operated by SOLA as a lessee of the government and

15  produced approximately hundred of thousands of long tons of butyl rubber during the period of

16  federal government ownership.  In April 1955, the facility was sold to Esso Standard Oil

17  Company.  Ex. 4 at 5, 23-24.  The butadiene plant was similarly constructed and owned by the

18  government.

19      60.    Again, the federal government had operational control and oversight.  For

20  example, in April 1947, SOLA requested authorization to construct a "General Separator."  This

21  proposal was based on plans prepared in 1946 to replace the temporary separator at the outlet of

22  the 72-inch sewer serving Plancor 572 and the other plants in the Chemical Products area.

23  Ex. 15.  The 1947 request was denied by the RRC.  Approval by the federal government to

24  construct a "new separator at the outlet of the sewer from the Butyl Rubber Plant" was ultimately

25  received by September 1949 and construction of the unit commenced.  Ex. 16.

26      61.    Indeed, a federal court has already made factual findings regarding the level of

27  control at these synthetic rubber plants.  That court recounted the following background:

28  "Synthetic rubber was also critical to the defense effort. After Pearl Harbor, the United States lost

18

access to Southeast Asia's natural rubber sources.  President Roosevelt designated synthetic

rubber as a strategic and critical war material on June 28, 1940.  The federal government created

the Rubber Reserve Company as a subsidiary of the Defense Supplies Corporation to provide

synthetic rubber for military and civilian requirements.  The Rubber Reserve Company had the

authority to oversee the operation of synthetic-rubber plants owned by the Defense Supplies

Corporation to produce synthetic rubber for national defense purposes.  Unlike the Baytown and

Baton Rouge [petroleum] refineries, which were owned by Humble and Standard Oil

respectively, these chemical plants, or 'plancors' were owned by the federal government." *Exxon

Mobil Corp. vs. United States*, 2020 WL 5573048 at *6, 14 (S.D. Texas Sept. 16, 2020).  *See also*

Ex. 2 at 9.

62.    The court found that "a federal network of agencies was created or adapted to

coordinate the manufacture of war materials and their distribution to meet America's military

needs around the world.  These agencies exerted significant control over the operations of

refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war

materials.  The government controlled access to the raw materials needed to run a petroleum

refinery.  The government used its authority to control access to the raw materials to help ensure

that companies like Humble and Standard Oil entered into contracts to produce avgas, rubber, and

other products.  The government also used that authority to control many aspects of the refining

process and operations." *Id*.

63.    In addition, the court found that the federal government's control and oversight

over the synthetic rubber plants (as distinct from general refinery operations) was such that it

qualified as a prior operator of those synthetic rubber plants for purposes of CERCLA.  The court

noted that ExxonMobil's predecessors at both Baytown and Baton Rouge had to "obtain

government approval for, among other things, any plant-related expenditure exceeding $1000; the

disposal of waste, scrap, byproducts, and surplus materials and equipment; additions or alterations

to the plants; and increasing employee salaries and benefits." *Exxon Mobil*, 108 F. Supp. 3d at

531.  In addition, a "government official was also permanently stationed at one of the Baytown

plants." *Id*.  The court quoted a communication from that government official to Humble to show

19

the level of control he exerted: "On numerous occasions I sit in my office looking out of the window along about a quarter to five and can see the men gathering up through the aisles of the boiler house section and lining up to make a rush for the time clocks at five o'clock. Since this matter has not just occasionally happened, but has been constant for weeks, it is running into a considerable loss of time.... Please take steps with the general contractor to see that the condition is eliminated or the matter will have to be taken up with Washington, where I am sure we can get results." *Id.* The court found the official "played a substantial role in overseeing day-to-day operations." *Id.*

64.    **Government Subjection, Guidance or Control Over ExxonMobil.** ExxonMobil's federally-owned plants were subject to federal production and operational control requirements. The creation of an entire industry at the direction of the federal government, the lack of commercial availability of the products otherwise, and the federal government oversight makes this more than an "arm's-length business relationship" between industry and the government. *San Mateo*, 32 F.4th at 758. The "acted under" component of the causal nexus element is satisfied.

### b. ExxonMobil's Acts Under Color of Federal Officer Relate to Claims in the Litigation

65.    The second component of the "causal nexus" element—the relation between the ExxonMobil's government-directed acts and plaintiff's claims—is also satisfied here.

66.    "[T]he hurdle erected by th[at] [second] causal-connection requirement is quite low." *Goncalves*, 865 F.3d at 1244. It requires "only that the challenged acts occurred because of what [ExxonMobil] [was] asked to do by the Government," *id.* at 1245—that is, that "the acts complained of [simply] 'relate to' acts taken under color of federal office." *Philadelphia*, 790 F.3d at 472.

67.    **Nexus to Wartime Butyl and Butadiene.** Here, Plaintiff's claims "relate to" ExxonMobil's synthetic rubber manufacturing through the nexus of alleged plastic pollution.

68.    The synthetic rubber industry was created under the control of the federal government during World War II, advancing the state of the industry by decades. The synthetic

20

1   rubber industry likely would not exist as we know it without federal government control during

2   the 1940s and 1950s.  And ExxonMobil (through its predecessors) was a participant in the

3   government-controlled and directed growth of that industry.

4        69.    Butyl and butadiene were used to make tires, among other products, for the war

5   effort.  The only source for butyl in the United States was the government-owned and operated

6   facilities described above at Baytown and Baton Rouge; the federal government purchased all the

7   butyl manufactured at both locations.  Butadiene was manufactured at Baytown and Baton Rouge,

8   but also at other facilities in the United States.  Ex. 2 at 26.

9        70.    After the attack on Pearl Harbor, the United States entered the war and California

10  became an important base for military operations.[7]  California was home to at least 31 major

11  military installations, and many minor ones, from 1939 to 1945.  And at all of those facilities,

12  officers, enlisted men, and civilian employees drove jeeps, trucks, and other military vehicles.

13  The U.S. Navy turned Yosemite National Park's Ahwahnee Hotel into a temporary rehabilitation

14  hospital, and that remote facility had 14 total vehicles: six large trucks, two pick-up trucks, two

15  ambulances, two buses, a sedan, and a shore-patrol wagon.[8]  The Army Corps of Engineers lists

16  at least 25 motor pool, vehicle maintenance, and vehicle storage buildings constructed at

17  California military bases between 1939 and 1945.[9]  The Corps also estimates that "the World War

18  II effort left behind hundreds of thousands of buildings in California."[10]

19

20

---

21  [7] Stephen D. Mikesell, *The History and Historic Resources of the Military in California*, *1769-*
    *1989*, *Vol. II* (March 2000), *available at* https://www.denix.osd.mil/cr/denix-
22  files/sites/19/2016/02/09_California-Historic-Military-Buildings-and-Structures-Inventory-
    Volume-2.pdf.
23  [8] *History of the United States Naval Special Hospital, Yosemite National Park*, available at
    https://digirepo.nlm.nih.gov/ext/dw/101606073/PDF/101606073.pdf.
24  [9] Stephen D. Mikesell, *The History and Historic Resources of the Military in California*, *1769-*
    *1989*, *Vol. IV* (March 2000), *available at* https://www.denix.osd.mil/cr/denix-
25  files/sites/19/2016/02/11_California-Historic-Military-Buildings-and-Structures-Inventory-
26  Appendices.pdf.
    [10] Stephen D. Mikesell, *The History and Historic Resources of the Military in California*, *1769-*
27  *1989*, *Vol. II* (March 2000), *available at* https://www.denix.osd.mil/cr/denix-
    files/sites/19/2016/02/09_California-Historic-Military-Buildings-and-Structures-Inventory-
28  Volume-2.pdf.

71.    Because ExxonMobil predecessors were the only source of butyl and a source of butadiene, any tires made with those components during World War II included butyl from Baytown or Baton Rouge and may also have included butadiene from those two locations. And if the butadiene was not from Baytown or Baton Rouge, it would have come from a different government constructed and owned facility within the United States.

72.    Now, Plaintiff's lawsuit seeks to hold ExxonMobil liable for alleged plastic pollution, which Plaintiff's allegations have traced to some of the very products (like synthetic rubber tires) that exist in part due to the government-directed wartime synthetic rubber manufacturing industry. Indeed, according to Plaintiff, "non-single-use-plastic materials" including "waste tires" constitute part of the feedstock used in the advanced recycling process that Plaintiff now blames for increased plastic consumption and worsened plastic pollution. *E.g.*, Compl. ¶¶ 330-31.

73.    In addition, Plaintiff's lawsuit seeks abatement, which could involve the cleanup (or an abatement fund to pay for the cleanup) plastic pollution, including from the synthetic rubbers created at the direction of the federal government during World War II (whether from Baytown or Baton Rouge or elsewhere).[11] Compl. ¶¶ 271 & n.125, 463. California regulates and manages waste tires within the state. https://calrecycle.ca.gov/tires/.

74.    The Complaint passes the "quite low" bar for the required causal nexus to ExxonMobil's past acts taken under color of federal office. *Goncalves*, 865 F.3d at 1244. Plaintiff's allegations about plastic pollution, including that from synthetic-rubber tires,

---

[11] ExxonMobil does not concede and actively disputes that it could have liability for such conduct or that it could be required to abate or fund an abatement plan as alleged in the Complaint.

sufficiently "relates to" ExxonMobil's acts under the government developing and manufacturing that very same synthetic rubber.

### c. ExxonMobil raises a colorable federal defense.

75. The last element of Section 1442 jurisdiction requires ExxonMobil to assert a "colorable federal defense." *DeFiore v. SOC LLC*, 85 F.4th 546, 558 (9th Cir. 2023). ExxonMobil satisfies this element with a federal contractor immunity defense.

76. Colorability under Section 1442 is not a high bar; it does not turn on "whether [the] defense will be successful," and "[d]efendants need not win their case before removal." *Id.*; *Stirling v. Minasian*, 955 F.3d 795, 801 (9th Cir. 2020) ("We do not express a view on whether this defense is 'in fact meritorious'; we hold only that it is 'colorable.'"). Accordingly, "[i]n construing the colorable federal defense requirement," the Supreme Court has long "rejected a narrow, grudging interpretation of the statute." *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 431 (1999). "And a removing defendant need not have a colorable federal defense for every claim; one colorable federal defense against one asserted claim is enough." *DeFiore*, 85 F.4th at 558. "The purpose of this requirement is to supply a federal element under which the defense to the action arises." *Id.* Finally, in addition to colorability, the federal defense must also "aris[e] out of [defendant's] official duties." *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981).

77. In addition to general federal defenses, including First Amendment protection and federal preemption, *see, e.g.*, *Stirling*, 955 F.3d at 801 (preemption), ExxonMobil has a colorable federal defense against Plaintiff's claims, including nuisance, under federal contractor immunity.

78. The federal-contractor defense bars "civil liabilities arising out of the performance of federal procurement contracts." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 506 (1988). The defense "broadly applies to any product supplied for government use so long as it conformed to the government's reasonably precise specifications." *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 946 (7th Cir. 2020). "That is all that the defense requires when it comes to the nature or quality of the goods." *Id.*

79. Accordingly, in *Baker*, where a defendant's predecessor operated a "refinery" that made "materials [that] were critical wartime commodities because they were necessary to make

23

essential military and civilian goods," the defendant had a colorable federal contractor defense to soil pollution claims relating to those refinery operations. *Baker*, 962 F.3d at 940. The fact that production occurred according to "according to detailed federal specifications" colorably immunized the defendants under the federal contractor doctrine. *Id.* at 940, 946-47.

80. Here, too, ExxonMobil (through its predecessors) operated government-owned plants and produced synthetic rubber "product[s] [that] went directly to the United States military to support its efforts in World War II," *see supra* at ¶¶ 60, 75. *Baker*, 962 F.3d at 946 (colorable defenses where even just "at least some of ISR's production went directly to the United States military"); Ex. 11.

81. And synthetic rubber production occurred according to "detailed federal specifications," *id.* at 944, as the government and its contractors worked in concert to "lift[] synthetic rubber technology from the test tube of the laboratory and transformed it into a full-blown industry." Ex. 4 at 1; *see also* Ex. 2 at 26-27.

82. Indeed, "the government here all but nationalized [synthetic rubber production] during World War II." *Id.* at 947. That supports a colorable federal defense against Plaintiff's claims arising out of ExxonMobil's conduct at the direction of the government.

## V. CONCLUSION

83. Because this case is removable pursuant to 28 U.S.C. §§ 1331, 1333, and 1442 further proceedings in the Superior Court of the State of California for the County of San Francisco should be discontinued, and the action should be removed to the United States District Court for the Northern District of California.

84. Counsel for ExxonMobil certifies that a copy of this Notice of Removal is being filed with the Clerk of the Superior Court of the State of California for the County of San Francisco, as required by 28 U.S.C. § 1446(d).

85. ExxonMobil reserves the right to amend or supplement this Notice of Removal, and reserves all rights and defenses, including those available under Federal Rule of Civil Procedure 12. By removing this action, ExxonMobil neither waives any defenses otherwise available to it, nor admits any of the allegations in Plaintiffs' Complaint.

1

2    Dated: November 1, 2024               O'MELVENY & MYERS LLP

3

4                                  By:    */s/ Dawn Sestito*

5                                        Dawn Sestito

6                               DAWN SESTITO (S.B. #214011)
                                  MATTHEW R. COWAN (S.B. #281114)

7                               O'MELVENY & MYERS LLP
                                  400 South Hope Street, 18th Floor

8                               Los Angeles, CA 90071-2899
                                  United States

9                               Telephone:   (213) 430-6000
                                  Facsimile:    (213) 430-6407

10                              dsestito@omm.com
                               mcowan@omm.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF REMOVAL OF CIVIL ACTION