Rob Bonta
Attorney General of California
Daniel A, Olivas (SBN 130405)
Senior Assistant Attorney General
Dennis L. Beck, Jr. (SBN 179492)
Acting Senior Assistant Attorney General
Deborah M. Smith (SBN 208960)
Vanessa Morrison (SBN 254002)
Supervising Deputy Attorneys General
Gabriel Martinez (SBN 275142)
Stephanie Lai (SBN 242959)
Hallie E. Kutak (SBN 322407)
Deputy Attorneys General
State Bar No. 275142
  1515 Clay Street, 20th Floor, P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone: (510) 879-1300
  E-mail: Deborah.Smith@doj.ca.gov
          Vanessa.Morrison@doj.ca.gov
          Gabriel.Martinez@doj.ca.gov
*Attorneys for Plaintiff The People of the State of
California ex rel. Rob Bonta Attorney General of
California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **THE PEOPLE OF THE STATE OF CALIFORNIA, EX REL. ROB BONTA, ATTORNEY GENERAL OF CALIFORNIA,**<br><br>Plaintiff,<br><br>v.<br><br>**EXXON MOBIL CORPORATION; AND DOES 1 THROUGH 100, INCLUSIVE,**<br><br>Defendants. | 3:24-cv-07594- RGS<br><br>**THE PEOPLE OF THE STATE OF CALIFORNIA'S NOTICE OF MOTION AND MOTION TO REMAND; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**<br>[Remand to the Superior Court of the State of California, County of San Francisco, Case No. CGC-24-61823]<br><br>Date:    TBD<br>Time:    1:30 p.m.<br>Dept:    Courtroom 3, 17th Floor<br>Judge:   The Honorable Richard G. Seeborg |

1

**TABLE OF CONTENTS**

2

Page

3    Statement of Issues to Be Decided ................................................................. 2

4    Introduction ................................................................................................ 2

     Factual And Procedural History ..................................................................... 3

5    Legal Standard for Removal .......................................................................... 5

6    Argument ................................................................................................... 5

7    I.    The Complaint Does Not Raise Any Maritime Claims That Would
           Implicate Admiralty Jurisdiction ........................................................ 5

8          A.    ExxonMobil Fails to Establish the Location Prong Required to
                 Support Maritime Jurisdiction Because the Harm Occurred in
9                California ............................................................................... 6

10         B.    ExxonMobil Fails to Establish the Second Prong That California's
                 Claims Involve a Disruption to Maritime Commerce. .................... 8

11         C.    ExxonMobil Fails to Establish the Third Prong, as the Complaint
                 Has No Nexus to a Traditional Maritime Activity. ........................ 9

12   II.   There Is No Federal Enclave Jurisdiction Over Plaintiff's Claims. ............ 10

13   III.  ExxonMobil Cannot Establish Federal Officer Jurisdiction by Re-writing
           the People's Complaint. .................................................................... 13

14         A.    ExxonMobil Did Not "Act Under" a Federal Officer. ................... 14

15               1.   As a preliminary matter, ExxonMobil provides insufficient
                      evidence for the court to find in its favor. ........................ 15

16               2.   ExxonMobil did not act under the subjection, guidance, or
17                    control of a federal officer ........................................... 17

           B.    ExxonMobil Fails to Present a Colorable Federal Defense. ............ 20

18         C.    ExxonMobil Fails to Establish Any Causal Connection Between
                 Consumer Deception and Rubber Production. ............................. 22
19
     Conclusion ............................................................................................... 24

20

21

22

23

24

25

26

27

28

i

1

# TABLE OF AUTHORITIES

2

**Page**

3

CASES

4

*Adams v. Montana Power Co.*
  528 F.2d 437 (9th Cir. 1975)................................................................................... 6, 8, 9

5

6

*Ali v. Rogers*
  780 F.3d 1229 (9th Cir. 2015)....................................................................................... 6

7

*Baker v. Atl. Richfield Co.*
  962 F.3d 937 (7th Cir. 2020)....................................................................................... 20

8

9

*Boyle v. United Tech. Corp.*
  487 U.S. 500 (1988) ............................................................................................. 20, 21

10

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*
  797 F.3d 720 (9th Cir. 2015) ...................................................................................... 19

11

12

*Caterpillar Inc. v. Williams*
  482 U.S. 386 (1987) ................................................................................................... 5, 7

13

14

*City & Cnty. of Honolulu v. Sunoco LP*
  39 F.4th 1101 (9th Cir. 2022)............................................................................... *passim*

15

*City of Oakland v. BP PLC*
  969 F.3d 895 (9th Cir. 2020)................................................................................... 5, 16

16

17

*County of San Mateo v. Chevron Corp.*
  32 F.4th 733 (9th Cir. 2022)................................................................................. *passim*

18

*Earth Island Inst. v. Crystal Geyser Water Co.*
  521 F. Supp. 3d 863 (N.D. Cal. 2021) ................................................................. *passim*

19

20

*Gaus v. Miles, Inc.*
  980 F.2d 564 (9th Cir. 1992)......................................................................................... 5

21

*Gruver v. Lesman Fisheries Inc.*
  489 F.3d 978 (9th Cir. 2007)......................................................................................... 6

22

23

*Hansen v. Grp. Health Coop.*
  902 F.3d 1051 (9th Cir. 2018)................................................................................. 5, 16

24

25

*Hunter v. Philip Morris USA*
  582 F.3d 1039 (9th Cir. 2009)....................................................................................... 5

26

*In re Blue Water Boating, Inc.*
  786 F. App'x 703 (9th Cir. 2019) ........................................................................ 8, 9, 10

27

28

ii

1

2

**TABLE OF AUTHORITIES**
(continued)

Page

3

4

*In re Methyl Tertiary Butyl Ether Products Liability Litigation*
    488 F.3d 112 (2d Cir. 2007).................................................................................. 15

5

*In re Mission Bay Jet Sports, LLC*
    570 F.3d 1124 (9th Cir. 2009)............................................................................. 6, 9

6

7

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*
    513 U.S. 527 (1995)................................................................................................ 9

8

9

*Lambert v. Johnson*
    852 F.2d 1289 (9th Cir. 1988).............................................................................. 19

10

*Leite v. Crane Co.*
    868 F. Supp. 2d 1023 (D. Haw. 2012) ................................................................ 20

11

12

*Merrell Dow Pharm. Inc. v. Thompson*
    478 U.S. 804 (1986)................................................................................................ 5

13

14

*Nat'l Audubon Soc'y v. Superior Court*
    33 Cal. 3d 419 (1983) .......................................................................................... 12

15

*Nevada v. Bank of Am. Corp.*
    672 F.3d 661 (9th Cir. 2012)................................................................................... 5

16

17

*New Mexico ex rel. Balderas v. Monsanto Co.*
    454 F. Supp. 3d 1132 (D.N.M. 2020) ............................................................. 12, 13

18

19

*Omega Env't, Inc. v. Gilbarco, Inc.*
    127 F.3d 1157 (9th Cir. 1997).............................................................................. 14

20

*Sec'y of the Interior v. California*
    464 U.S. 312 (1984).............................................................................................. 12

21

22

*Sierra Club, Inc. v. Exxon Mobil Corporation*
    24-cv-07288-RS. ECF Nos. 14-16 ......................................................................... 4

23

*State of California v. United States*
    235 F.2d 647 (9th Cir. 1956)................................................................................. 11

24

*The People of the State of California v. ExxonMobil Corp.*
    Case No. CGC-24-618323 ...................................................................................... 3

25

26

*Watson v. Phillip Morris Co.*
    551 U.S. 142 (2007) ........................................................................... 13, 14, 16, 19

27

28

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Willis v. Craig*

4
    555 F.2d 724 (9th Cir. 1977)............................................................................... 12

5

**STATUTES**

6

United States Code, Title 9
    § 1 ............................................................................................................................. 9

7

United States Code, Title 28

8
    § 1331 ....................................................................................................................... 4
    § 1333 .................................................................................................................. 4, 5

9
    § 1441 ....................................................................................................................... 4
    § 1442 ....................................................................................................................... 4

10
    § 1442, subd. (a)(1) ............................................................................................... 13

11
    § 1442, subd. (a)(1) ............................................................................................... 15

12

United States Code, Title 42
    § 9601 et seq. ........................................................................................................ 19

13
    § 9607, subd. (a) ................................................................................................... 19

14

United States Code, Title 43

15
    § 1302 ................................................................................................................ 9, 12
    § 1311 ................................................................................................................ 9, 12

16

California Business and Professions Code

17
    § 17200 ..................................................................................................................... 4
    § 17500 ..................................................................................................................... 4

18

19

California Public Resources Code
    § 30240 ..................................................................................................................... 9

20

Comprehensive Environmental Response, Compensation and Liability Act of 1980 ................. 19

21

Submerged Lands Act ............................................................................................................ 12

22

**CONSTITUTIONAL PROVISIONS**

23

United States Constitution

24
    First Amendment .................................................................................................... 20

25
    Article III, § 2, cl. 1 ................................................................................................. 6

26

27

28

## NOTICE OF MOTION AND MOTION TO REMAND

### TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Plaintiff the People of the State of California, ex rel. Rob Bonta, Attorney General of California ("California"), hereby moves the Court for an order pursuant to 28 U.S.C. § 1447(c) to remand this matter to the Superior Court of the State of California, County of San Francisco, Case No. CGC 24-618323.

The Court should grant Plaintiff's Motion for Remand ("Motion") because this Court lacks jurisdiction over the subject matter of this case. Plaintiff asserts no federal law claims, none of the claims arise under the Constitution, laws, or treaties of the United States, and Defendant's Notice of Removal fails to provide any basis for removal under 28 U.S.C. §§ 1331, 1333, 1441, and 1442. This Motion is based on the attached Memorandum of Points and Authorities, all exhibits filed in support of this Motion, oral argument of counsel, and any other materials submitted in connection with this Motion.

Dated:  December 9, 2024

Respectfully submitted,

ROB BONTA
Attorney General of California
DANIEL A. OLIVAS
Senior Assistant Attorney General
DENNIS L. BECK, JR.
Acting Senior Assistant Attorney General
VANESSA MORRISON
Supervising Deputy Attorney General


  /s/ Gabriel Martinez
GABRIEL MARTINEZ
STEPHANIE LAI
HALLIE KUTAK
Deputy Attorneys General
*Attorneys for Plaintiff The People of the State of California ex rel. Rob Bonta Attorney General of California*

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF ISSUES TO BE DECIDED

1. Has Defendant Exxon Mobil Corp. ("ExxonMobil") met its burden to overcome the strong presumption against removal jurisdiction where the Complaint alleges only state law claims and seeks relief only to state harms?

2. Is removal proper based on admiralty and maritime jurisdiction where none of the conduct giving rise to the causes of action took place on navigable waters or would disrupt maritime commerce, and there is not a relationship to any traditional maritime activity?

3. Is removal proper based on federal enclave jurisdiction where all the alleged harms occurred in California, and the Complaint expressly disclaims any injuries arising on federal and tribal lands and excepts any recovery or relief attributable to such lands?

4. Is removal proper based on the federal officer statute where ExxonMobil was not acting as a federal officer, does not assert a colorable defense, and there is no causal connection?

### INTRODUCTION

This is a straightforward enforcement action by a sovereign State invoking its statutory police power under state law, and it belongs in state court. The conduct that California is policing is ExxonMobil's deceptive disinformation campaign towards Californians regarding plastic's recyclability, which has harmed California's environment, wildlife, natural resources, and people. Plaintiff the People of the State of California, ex rel. Rob Bonta, Attorney General of California ("California") allege six causes of action, all of which arise under state law. Specifically, the Complaint alleges that ExxonMobil's deception caused a public nuisance under state common law (first cause of action), destroyed the state's natural resources in violation of state environmental laws (second and third causes of action), and constituted misleading and deceptive marketing, including unfair or fraudulent business practices, in violation of state corporate law (fourth, fifth, and sixth causes of action). ECF No. 1, Notice of Removal, Declaration of Dawn Sestito (hereinafter, "Decl. Sestito"), Ex. 1 thereto, Complaint (hereinafter, "Compl."), ¶¶ 423-462.

ExxonMobil's removal was improper and relies on arguments that have been squarely rejected by the Ninth Circuit Court of Appeals in *City & Cnty. of Honolulu v. Sunoco LP,* 39 F.4th 1101, 1111 (9th Cir. 2022) (affirming district court's order of remand) and *County of San*

2

1  *Mateo v. Chevron Corp.*, 32 F.4th 733 (9th Cir. 2022) (same) and in this District. *Earth Island*

2  *Inst. v. Crystal Geyser Water Co.*, 521 F. Supp. 3d 863, 880 (N.D. Cal. 2021) (granting remand).

3  ExxonMobil's similar contentions that removal is appropriate here under (1) admiralty and

4  maritime jurisdiction, (2) federal enclave jurisdiction, and (3) federal officer jurisdiction lack

5  merit.

6        ExxonMobil fails to establish maritime or admiralty jurisdiction because the Complaint is

7  based on allegations of consumer deception concerning plastics recycling, which plainly do not

8  implicate traditional admiralty or maritime activity. ExxonMobil cannot establish that the

9  material events alleged in the Complaint and giving rise to its claims occur within a federal

10  enclave, especially considering the Complaint expressly disclaims injuries arising on federal

11  lands and excepts relief from any such injuries. Finally, ExxonMobil fails to provide any basis for

12  federal officer removal as it has failed to tie its World War II-era production of rubber to the

13  plastic deception allegations of the Complaint.

14        ExxonMobil has not, and more importantly, cannot meet its burden to show removal was

15  proper. Therefore, the People respectfully ask the Court to remand this action to the Superior

16  Court of California for the County of San Francisco.

17  **FACTUAL AND PROCEDURAL HISTORY**

18        On September 23, 2024, the People filed a Complaint in the Superior Court of the State of

19  California, County of San Francisco. *The People of the State of California v. ExxonMobil Corp.*,

20  Case No. CGC-24-618323. The Complaint alleges six causes of action centered around

21  ExxonMobil's decades-long "deceptive public messaging regarding plastic recycling." Compl. ¶

22  1.

23        The Complaint alleges that for decades, ExxonMobil deceptively promoted mechanical

24  recycling, and now "advanced recycling," as the solution to plastic waste. Compl. ¶ 2. The

25  Complaint further alleges that beginning around the 1970's, ExxonMobil knew or should have

26  known that recycling was not a feasible method to handle the increasing volumes of plastic waste

27  and therefore was not a viable solution to the burgeoning plastic waste and pollution problem. *Id.*

28  at ¶¶ 3, 108. Despite this knowledge, ExxonMobil pointedly and aggressively promoted

recycling, and now advanced recycling, to the California public through advertisements and public messaging while concealing its extreme technical and practical limitations. *Id*. at ¶ 5. The Complaint details how ExxonMobil's deception about plastic recycling caused, and is currently causing, unique harm to California's natural resources, economy, recreation, and its people. *Id*. at pp. 114-134.

The Complaint seeks relief specific to ExxonMobil's harms to California. The Prayer for Relief asks for ExxonMobil to "abate the ongoing public nuisance their conduct has created in California" (Compl. ¶ 463, public nuisance) and for equitable relief preventing the "destruction of the natural resources of California." (Compl. ¶ 465, destruction of natural resources). Additionally, the Prayer for Relief asks that ExxonMobil "remove any substance placed in the waters of the State" and for "reasonable costs incurred by the State in cleaning up" plastic pollution (Compl. ¶¶ 470-75, water pollution). Finally, the Prayer for Relief asks for civil penalties under California law, for example penalties under California Business and Professions Code sections 17500 and 17200 (Compl. ¶¶ 464, 468, 467, misleading advertising and unfair business practices).

The Complaint expressly disclaims any injuries on federal land:

> In this Complaint, the term "State" refers to the State of California, unless otherwise stated. The term "California" refers to the area falling within the State's geographic boundaries, unless otherwise stated. The State expressly disclaims injuries arising on federal land and tribal lands held in trust by the United States and does not seek recovery or relief attributable to these injuries.

Compl. ¶ 1, n.1.

On November 1, 2024, ExxonMobil filed a Notice of Removal to the United States District Court for the Northern District of California, asserting federal jurisdiction under 28 U.S.C. §§ 1331, 1333, 1441, and 1442. Notice of Removal ¶ 2. ExxonMobil argued removal is appropriate under maritime and admiralty jurisdiction, federal enclave jurisdiction, and federal officer jurisdiction. *Id.* at ¶¶ 7, 8. On November 12, 2024, the case was related to *Sierra Club, Inc. v. Exxon Mobil Corporation*, 24-cv-07288-RS. ECF Nos. 14-16.

4

1

**LEGAL STANDARD FOR REMOVAL**

2    Federal courts are courts of limited jurisdiction, and "statutes extending federal jurisdiction

3  are narrowly construed so as not to reach beyond the limits intended by Congress." *City of*

4  *Oakland v. BP PLC*, 969 F.3d 895, 903 (9th Cir. 2020). There is a strong presumption *against*

5  removal, and a removal statute is strictly construed against finding federal jurisdiction. *Gaus v.*

6  *Miles, Inc.,* 980 F.2d 564, 566 (9th Cir. 1992); *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 667

7  (9th Cir. 2012). In fact, "federal jurisdiction must be rejected if there is *any doubt* as to the right

8  of removal in the first instance." *Id.* (emphasis added). The defendant "bears the burden of

9  overcoming the strong presumption against removal jurisdiction," *Hansen v. Grp. Health Coop.*,

10  902 F.3d 1051, 1057 (9th Cir. 2018) (internal quotation marks omitted), and "the court resolves

11  all ambiguity in favor of remand to state court." *Hunter v. Philip Morris USA*, 582 F.3d 1039,

12  1042 (9th Cir. 2009) (internal quotation marks omitted) (quoting *Gaus,* 980 F.2d at 566).

13

**ARGUMENT**

14    Under the well-pleaded complaint rule, the plaintiff "is master of the claim; he or she may

15  avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc. v. Williams*, 482

16  U.S. 386, 392 (1987). That is the case here: the People do not seek any relief under federal law

17  and do not premise their claims or in any way rely on violations of federal law. ExxonMobil may

18  not remove the state-law claims in this case by recharacterizing them as claims for federal-law

19  relief: "Jurisdiction may not be sustained on a theory that the plaintiff has not advanced." *Merrell*

20  *Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 809 n.6 (1986).

21    Without a federal claim to point to, ExxonMobil attempts to recast the People's Complaint

22  as one arising on the navigable waters of the United States, or in the alternative, arising on federal

23  enclaves within California, or, finally, as somehow the result of its alleged predecessor's war-

24  time efforts to manufacture rubber. These far-fetched bases do not withstand judicial scrutiny.

25  **I.    THE COMPLAINT DOES NOT RAISE ANY MARITIME CLAIMS THAT WOULD**
     **IMPLICATE ADMIRALTY JURISDICTION**

26

27    ExxonMobil first asserts federal jurisdiction on an argument that there is maritime

28  jurisdiction under 28 U.S.C. § 1333. Notice of Removal ¶ 7. But the Complaint concerns

5

1    deceptions regarding the recyclability of plastics, not a traditional admiralty or maritime activity.

2        The United States Constitution grants original jurisdiction to federal courts to hear all cases

3    of admiralty and maritime jurisdiction. *See* U.S. Const. art. III, § 2, cl. 1.[1] "A party seeking to

4    invoke federal admiralty jurisdiction over a tort claim must satisfy both a location test and a

5    connection test." *In re Mission Bay Jet Sports, LLC*, 570 F.3d 1124, 1126 (9th Cir. 2009) (internal

6    quotation marks omitted). There are three components to the location and connection test. The

7    relevant tort: (1) must have taken place on navigable water (or a vessel on navigable water having

8    caused an injury on land; (2) a must have a potentially disruptive impact on maritime commerce;

9    and (3) must have a substantial relationship to traditional maritime activity. *Ali v. Rogers*, 780

10   F.3d 1229, 1235 (9th Cir. 2015). Here, California's claims do not occur on navigable water, are

11   not disruptive to maritime commerce, and do not implicate any traditional maritime activity.

12       **A.    ExxonMobil Fails to Establish the Location Prong Required to Support
              Maritime Jurisdiction Because the Harm Occurred in California.**
13

14       A cause of action sounding in tort is not cognizable under admiralty jurisdiction unless the

15   alleged wrong occurs on navigable waters *and* bears a significant relationship to traditional

16   maritime activity. *Adams v. Montana Power Co.*, 528 F.2d 437, 439 (9th Cir. 1975). "The

17   'location' prong thus focuses on whether the tort occurred on navigable water or whether injury

18   suffered on land was caused by a vessel on navigable water." *In re Mission Bay*, 570 F.3d at

19   1126. Neither of these elements are present here.

20       First, it is beyond dispute that there is no maritime "vessel" at all. Similarly, there is no tort

21   that arose on navigable waters. The Complaint does not allege that ExxonMobil dumped plastic

22   on California's beaches or in its navigable waters. Instead, the tort occurred when ExxonMobil

23   "deceptively promot[ed] that recycling would take care of the consequent tremendous increase in

24   plastic waste." Compl. ¶¶ 427, 457. The deception took place as ExxonMobil advertised through

25   _____

26       [1] Courts have treated the terms "admiralty" and "maritime" jurisdiction interchangeably.
     *See, e.g. Gruver v. Lesman Fisheries Inc.*, 489 F.3d 978, 982 (9th Cir. 2007) ("Historically,

27   *admiralty jurisdiction* turned solely on the question of whether the tort occurred on navigable
     waters. Over time, however, the test has been refined. Today, a party seeking to invoke federal

28   *maritime jurisdiction* over a tort claim must satisfy both a location test and a connection test.")
     (internal citation omitted) (emphasis added).

6

various media channels, harming Californians by deceiving them in their homes, places of business, schools, and in public generally—patently not on navigable waters. The Complaint alleges that ExxonMobil's *deceptive conduct* led to the plastic pollution now found throughout California, resulting in a public nuisance, water pollution, and destruction of natural resources (and other violations). *See* Compl. ¶¶ 5-6. ExxonMobil continues to harm Californians by promoting false claims about recycling to Californians that continues to this day. *E.g.*, Compl. ¶ 335 (displaying an Exxon "X" post claiming Advanced Recycling can turn chip bags into Ferraris).

ExxonMobil argues that because plastic pollution eventually reaches federal and international waters, the site of the harm favors removal. Notice of Removal ¶ 13. However, the first paragraph, footnote 1 of the Complaint expressly disclaims any injuries arising on federal lands and does not seek recovery or relief stemming from those injuries. Compl. ¶ 1. Instead, the People seek redress for harms occurring within California's geographical boundaries. In fact, the People's Prayer for Relief seeks abatement for the nuisance "in California" and equitable relief to prevent "destruction of natural resources of California." Compl. ¶¶ 463, 465. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (the plaintiff "is master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law"); *see also Honolulu*, 39 F.4th at 1111 (rejecting the defendants attempts to "recharacterize the claims from deceptive practices to [oil and gas] activities").

ExxonMobil's arguments cannot establish federal jurisdiction for reasons explained in *Earth Island Inst. v. Crystal Geyser Water Co.* In that case, the plaintiff alleged that the defendants created a public nuisance with plastic pollution on California's coasts and waterways. *Earth Island Inst.*, 521 F. Supp. 3d at 867. The defendants argued for removal based on plastic pollution impacting federal and international waters. *Id.* The court, recognizing that the plaintiff, not the defendant, is the "master of the claim," found that "even if these injuries arguably may have occurred at some point on navigable waters, Plaintiff has only pled torts occurring in California waterways and coasts, rather than oceanic waters, navigable waters of the United

1    States, federal enclaves, or the waters of multiple states." *Id.* at 880 (granting remand). Here, too,

2    the Complaint only pleads torts occurring within California for harms within California.

3         The gaps in jurisdiction cannot be filled by ExxonMobil's cherry-picking of the

4    Complaint's passing references to federal and global ocean plastic pollution. Notice of Removal ¶

5    14 (claiming the site of the harm is "interstate and international"). The statements on which the

6    Notice of Removal focuses merely set the scene—they do not define the claim or the relief

7    sought. Instead, this information provides context about the harms of plastic pollution globally

8    and recognizes the unsurprising fact that such pollution is widespread. The Complaint expressly

9    does not allege violations of California law based on global pollution, nor does it seek relief based

10   on global pollution harm. Even the Complaint's allegations regarding water pollution are for

11   violations within California. Compl. ¶¶ 449-454 ("Defendants, through their deception, permitted

12   to pass into the *waters of the State* plastic waste") (emphasis added). As the *Earth Island* court

13   found, "[t]o the extent Defendants refer to sections of the Complaint that highlight global

14   pollution, the Court finds that such references are not elements of Plaintiff's causes of action, and

15   do not make this a maritime or admiralty case [. . .]." *Earth Island Inst.*, 521 F. Supp. 3d at 880.

16   The Court here should similarly reject the ExxonMobil's attempt to manufacture federal

17   jurisdiction.

18        **B.    ExxonMobil Fails to Establish the Second Prong That California's Claims
              Involve a Disruption to Maritime Commerce.**
19

20        ExxonMobil alleges California's claims relate to maritime commerce because the

21   Complaint alleges harms to recreation and commerce on California's waterways generally. Notice

22   of Removal ¶ 18. But not all commerce on waterways is recognized as maritime commerce.

23   "Commerce for the purpose of admiralty jurisdiction means activities related to the business of

24   shipping." *Adams v. Montana Power Co.*, 528 F.2d 437, 439 (9th Cir. 1975); *see also In re Blue

25   Water Boating, Inc.*, 786 F. App'x 703, 704–05 (9th Cir. 2019) (tort claim from recreational

26   stand-up-paddle-board rental in the Santa Barbara Harbor was not traditional maritime activity).

27   This is because the "purpose behind the grant of admiralty jurisdiction was the protection and the

28

8

1    promotion of the maritime shipping industry." *Id.*; *see also Jerome B. Grubart, Inc. v. Great*

2    *Lakes Dredge & Dock Co.,* 513 U.S. 527, 539 (1995) (relevant inquiry to determine disruption to

3    maritime commerce is "whether the incident could be seen within a class of incidents that posed

4    more than a fanciful risk to commercial shipping").

5            References to recreational fishing and boating do not transform the Complaint from one of

6    consumer deception into acts and omissions involving the business of shipping, which is

7    necessary to support maritime jurisdiction. *See Adams*, 528 F.2d at 439 ("Neither non-commercial

8    fishing nor pleasure boating nor water skiing constitutes commerce."). And California only

9    references commercial fishing under the section titled "ExxonMobil Substantially Caused and Is

10   Causing Plastic Waste and Pollution That Harm *California's Local Coastal Economies*." Compl.

11   ¶ 125 (emphasis added). Furthermore, the coastal zone, extending three miles seaward from the

12   coast, is within California's jurisdiction. *See* 43 U.S.C. §§ 1302, 1311 ("[T]he coastal zone

13   belongs to the states"); *see also* Cal. Pub. Res. Code § 30240 (protecting marine organisms for

14   "commercial, recreational, scientific, and educational purposes" in California's marine

15   environment). The Complaint disclaims injuries outside of California's boundaries. Compl. ¶ 1,

16   fn 1. The harms California alleges are not regarding the business of shipping and do not relate to

17   any injuries suffered on federal land.

18           **C.    ExxonMobil Fails to Establish the Third Prong, as the Complaint Has No**
             **Nexus to a Traditional Maritime Activity.**
19

20           The allegations in the Complaint plainly do not relate to any traditional maritime activity.

21   To satisfy the "connection" or "nexus" test, the tort must "bear a significant relationship to

22   traditional maritime activity." *In re Mission Bay*, 570 F.3d at 1126. The term "maritime

23   transactions" is defined by statute as "charter parties, bills of lading of water carriers, agreements

24   relating to wharfage, supplies furnished vessels or repairs to vessels, [and] collisions." 9 U.S.C.

25   §1 (defining "Maritime transactions").

26           Admiralty and maritime activity have nothing to do with the Complaint's allegations that

27   ExxonMobil engaged in deception regarding plastic recycling in California, which form the basis

28

9

for the Complaint's six causes of action. The Ninth Circuit has explained that "traditional maritime activity. . . generally relates to specialized rules and technical concepts of maritime commerce such as maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage, as well as the navigation, storage, and maintenance of traditional vessels." *In re Blue Water Boating, Inc.*, 786 F. App'x 703, 704–05 (9th Cir. 2019). The Complaint is not based on maritime liens, claims for salvage, vessels, or any traditional maritime activity. ExxonMobil argues that the relevant activity is plastic pollution. Notice of Removal at ¶¶ 21-24. But this conflates the harm (pollution) with the activity (producing mass amounts of the building blocks of plastic) and the alleged unlawful act (engaging in deceptive practices to convince Californians that said activity would not cause the harm because of the feasibility and efficacy of plastic recycling). The relevant activity is ExxonMobil's decades-long deceptive conduct regarding the recyclability of plastic. Compl. ¶ 1. This activity is clearly not maritime activity.

ExxonMobil relies on inapposite cases involving oil spills. The relevant tortious activity there, unlike here, were the spills themselves. Notice of Removal at ¶ 22. Here, California's allegations are based on ExxonMobil's decades of deceptions regarding the recyclability of plastics. Compl. ¶¶ 1-2 (ExxonMobil has "deceived Californians for almost half a century"). This bears no relation to traditional maritime activity.[2]

In sum, ExxonMobil fails to establish any of the three components to the location and connection test to invoke admiralty and maritime jurisdiction.

## II.    THERE IS NO FEDERAL ENCLAVE JURISDICTION OVER PLAINTIFF'S CLAIMS.

ExxonMobil's attempt to broaden application of federal enclave jurisdiction relies on the same unsuccessful arguments raised by petrochemical companies (including ExxonMobil) in other lawsuits, and again there is no basis to depart from the Ninth Circuit's reasoning here. *See San Mateo,* 32 F.4th at 750 (finding energy companies failed to establish that a federal issue is

---

[2] ExxonMobil also includes references to background information in the complaint related to plastic waste exports to China, plastic in the Pacific Ocean, and boat navigation. Notice of Removal ¶ 23. As explained above, California has disclaimed federal injuries and background references "are not elements of Plaintiff's causes of action." *Earth Island*, 521 F. Supp. 3d 880.

10

1  "necessarily raised" where "the connection between conduct on federal enclaves and the [ ]

2  alleged injuries is too attenuated and remote to establish the [plaintiff's] cause of action is

3  governed by federal enclave jurisdiction"); *Honolulu,* 39 F.4th at 1111-12 (same).

4        The federal enclave doctrine permits federal courts to exercise jurisdiction over claims that

5  arise from conduct on federal enclaves. *Honolulu,* 39 F.4th at 1111-12; *San Mateo*, 32 F.4th at

6  748–49 (citing U.S. Const. art. I, § 8, cl. 17). Federal question jurisdiction applies only when "the

7  locus in which the claim arose" is within a federal enclave. *San Mateo,* 32 F.4th at 749 (citing

8  *Alvares v. Erickson*, 514 F.2d 156, 160 (9th Cir. 1975)). To justify removal, ExxonMobil "bear[s]

9  the burden of establishing that the material events alleged in the complaint and giving rise to [the

10  People's] claims occurred in" an enclave. *Earth Island Institute,* 521 F.Supp.3d at 878 (citing

11  *Coleman v. Trans Bay Cable, LLC*, No. 19-CV-02825-YGR, 2019 WL 3817822, at *3 (N.D. Cal.

12  Aug. 14, 2019)).

13        In *Honolulu*, the Ninth Circuit characterized the attempt by the oil companies (including

14  ExxonMobil) to invoke federal enclave jurisdiction as a "ploy" and reasoned "even if much of

15  [the petrochemical companies'] oil and gas operations occurred on federal enclaves, that still does

16  not transform Plaintiff's claims about deceptive practices into claims about the conduct itself." *Id.*

17  at 1112. That reasoning directly applies here. California's claims involve deceptive practices that

18  categorically do not arise within the "locus" of a federal enclave, nor do the alleged harms "occur

19  exclusively in a federal enclave." Thus, federal enclave jurisdiction simply does not apply.

20        "Federal enclave jurisdiction exists only where the claim arises on the federal enclave—not

21  just near it." *Earth Island Institute*, 521 F.Supp.3d at 878 (citing *State v. Monsanto Co.*, 274 F.

22  Supp. 3d 1125, 1132 (W.D. Wash. 2017), aff'd, 738 F. App'x 554 (9th Cir. 2018) (where plaintiff

23  did not seek relief for contamination of federal territories and would have no standing to do so,

24  court was "satisfied" that none of plaintiff's claims arose on federal enclaves). Water is not part

25  of a federal enclave merely because it is adjacent to or near the enclave or flows into or out of it.

26  *See*, *e.g.*, *State of California v. United States*, 235 F.2d 647, 656 (9th Cir. 1956).

27        Here, ExxonMobil fails to demonstrate that federal enclave jurisdiction applies and instead

28  resorts to ignoring the well-pled allegations in the Complaint. It disregards the People's specific

11

allegations, improperly relies on claims regarding waterways near or adjacent to federal lands, and lacks factual evidence of harm occurring on federal enclaves. Most glaringly, ExxonMobil disregards the express disclaimer of any injuries arising on federal lands, which would include federal enclaves, and the fact that the Complaint does not seek recovery or relief stemming from such injuries. Compl. n.1. Federal enclave jurisdiction is not triggered merely because federal lands are nearby or connected to the affected areas; it applies only when the harm unequivocally arises within the federal enclave itself. *New Mexico ex rel. Balderas v. Monsanto Co.*, 454 F. Supp. 3d 1132, 1146 (D.N.M. 2020) (citing *Monsanto Co.*, 274 F. Supp. 3d at 1132); *Willis v. Craig*, 555 F.2d 724, 725 (9th Cir. 1977).

The Complaint specifically alleges harms to California's waterways and coasts, among other California-centric harms. Compl. ¶¶ 360-372 (waterways and coasts), ¶¶ 369-372 (California's wildlife), ¶¶ 373-378 (recreation), ¶¶ 379-389 (California's communities of color and low-income populations), ¶¶ 390-91 (local coastal economies), ¶¶ 392-422 (state economy). None of these areas fall exclusively under the ownership or control of the federal government.

The law is clear that California's waterways and coasts are state lands not subject to federal enclave jurisdiction. *Earth Island Institute*, 521 F.Supp.3d at 878–79. They are owned by the State of California on behalf of its people via the public trust doctrine. *See, e.g., Nat'l Audubon Soc'y v. Superior Court*, 33 Cal. 3d 419, 435 (1983). Congress has also demarcated the coastal lands extending three miles seaward from the coast as state lands, while lands beyond this boundary—the outer continental shelf—are federally managed. *Sec'y of the Interior v. California*, 464 U.S. 312, 316 (1984) ("By virtue of the Submerged Lands Act, passed in 1953, the coastal zone belongs to the states, while the [outer continental shelf] belongs to the federal government."); *see also* 43 U.S.C. §§ 1302, 1311.

ExxonMobil identifies a litany of federal enclaves within California that it claims could potentially be implicated but only one purported federal enclave where it alleges harm actually arose—the Monterey Bay National Marine Sanctuary. The Monterey Bay National Marine Sanctuary is indeed federally managed, but it is not the locus of the conduct giving rise to the People's claims regarding deceptive practices, nor is it an injury alleged in the Complaint.

*Honolulu*, 39 F.4th at 1112. The Complaint merely alleges that plastic waste has been found there to illustrate the breadth of crisis and risk to the environment. Compl. ¶ 360. None of the relief requested in the Complaint is specific to the Monterey Bay National Marine Sanctuary—to the contrary, the Complaint expressly disclaims any relief arising from injuries on federal land (Compl. n.1), and any activity there is far too remote and attenuated from the People's injuries to support federal enclave jurisdiction. Thus, "[i]t would require the most tortured reading of the Complaint[] to find jurisdiction on this basis." *Honolulu*, 39 F.4th at 1111, internal citations omitted.

As to the remainder of federal enclaves that exist in California, ExxonMobil fails to identify which (if any) of these federal enclaves were allegedly harmed, nor does it identify any federal enclave as the locus of the events in question. In near identical circumstances, courts have declined to find enclave jurisdiction. *E.g., Earth Island Institute,* 521 F.Supp.3d at 879 (denying federal enclave jurisdiction where defendant named a number of federal facilities and national park areas but failed to identify harm occurring within them); *New Mexico*, 454 F. Supp. 3d 1146 (rejecting jurisdiction where the alleged harm pertained only to state-managed natural resources, dismissing unsupported claims about proximity to federal enclaves as insufficient to invoke federal jurisdiction).

In sum, ExxonMobil fails to establish federal enclave jurisdiction. California has not alleged that its claims are based on torts taking place on a federal enclave. Rather, the Complaint raises state-law claims arising from injuries to Californians on California properties and within California's waterways by virtue of ExxonMobil deceptive practices.

## III.    ExxonMobil Cannot Establish Federal Officer Jurisdiction by Re-writing the People's Complaint.

The federal officer removal statute allows defendants to remove a civil action that is against or directed to the United States or any officer (or any person acting under that officer) in an official or individual capacity, under color of that office. 28 U.S.C. § 1442(a)(1). It is meant to protect federal officers acting within the scope of their authority from "interference by hostile state courts." *Watson v. Phillip Morris Co.*, 551 U.S. 142, 150 (2007).

13

To qualify for removal, ExxonMobil must show that: (1) it was "acting under" a federal officer, (2) it can assert a colorable federal defense, and (3) the People's lawsuit causally connects to Defendants' actions under a federal officer's direction. *Honolulu*, 39 F.4th at 1106. ExxonMobil fails to establish any of these three elements. In particular, ExxonMobil fails to provide the necessary evidence showing its alleged predecessors "acted under" a federal officer, or that they are in fact its predecessors in the first instance. It offers only conclusory federal defenses that this court has already denied under similar circumstances. Finally, ExxonMobil utterly fails to establish, nor could it establish, any causal nexus between World War II-era synthetic rubber production and the Complaint's allegations of ExxonMobil's deceptive statements about plastic recycling, which occurred decades later. Its arguments to the contrary would, in essence, permit any entity that ever contracted with the federal government to avoid litigating in a state court, regardless of the claims raised. The Ninth Circuit has already soundly rejected its arguments. *See San Mateo*, 32 F.4th at 758–59; *Honolulu*, 39 F.4th at 1106-07.

**A.    ExxonMobil Did Not "Act Under" a Federal Officer.**

"Acting under" a federal officer requires a special relationship, in which the entity "assists or . . . helps carry out the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152, 157. This relationship goes beyond "normal commercial or regulatory relationships" with a federal agency. *Honolulu*, 39 F.4th at 1107. Rather, this relationship requires a private actor "acting on behalf of the officer in a manner akin to an agency relationship" or being "subject to the officer's close direction, such as acting under the 'subjection, guidance, or control of the officer.'" *San Mateo*, 32 F.4th at 756 (quoting *Watson*, 551 U.S. at 151). The court also considers whether the activity at issue is "so closely related" to the government's federal duties that the private person faces "a significant risk of state-court 'prejudice,' just as a government employee would in similar circumstances."[3] *San Mateo*, 32 F.4th at 757, quoting *Watson*, 551 U.S. at 152. Whether an entity

---

[3] ExxonMobil fails to allege it was conducting activities "so closely related to the government's implementation of its federal duties" that it will suffer "a significant risk of state-court prejudice." Honolulu, 39 F. 4th at 1107. Failure to do so waives this argument. *See Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1167 (9th Cir. 1997).

14

is 'acting under' federal supervision is a fact-specific inquiry. *In re Methyl Tertiary Butyl Ether Products Liability Litigation*, 488 F.3d 112, 130 (2d Cir. 2007) ("*In re MTBE*").

**1.    As a preliminary matter, ExxonMobil provides insufficient evidence for the court to find in its favor.**

To show it acted "under" a federal officer, ExxonMobil asserts that it acted under federal direction during World War II and pursuant to ongoing rubber production agreements. Notice of Removal ¶ 55. Specifically, ExxonMobil points to two World War II-era synthetic rubber facilities, which it claims were owned by the federal government and operated by ExxonMobil's alleged "predecessor entities": (1) the Standard Oil of Louisiana ("Standard Oil") refinery in Baton Rouge, Louisiana, and (2) the Humble Oil and Refining Company ("Humble Oil") refinery in Baytown, Texas. *Id.* ¶¶ 54, 56-63. ExxonMobil claims that these alleged "predecessor" companies contracted with the federal government to produce synthetic rubber and that the federal government-maintained oversight over the operations. *Id.* ¶¶ 37, 54, 55, 56, 57, 59, 60, 63.

As an initial matter, ExxonMobil fails to include any contracts or agreements that would show (1) there are any continuing rights or obligations under the alleged contracts between Standard Oil, Humble Oil and the federal government; and (2) that when Exxon and Mobil merged in 1999, ExxonMobil became the successor to these alleged contracts and assumed any continuing rights and obligations. Nor does ExxonMobil provide any evidence that supports its claim that the federal government provided the requisite oversight and control over the production of synthetic rubber to transform Standard Oil and Humble Oil into federal officers. Absent these primary documents to support its allegations, ExxonMobil cannot show the requisite subjection, guidance, or control by the federal government, even with regard to rubber production 80 years in the past. *In re MTBE*, 488 F.3d at 131 ("in most instances, a contract, principal-agent relationship, or near-employee relationship with the government will be necessary to show the degree of direction by a federal officer necessary to invoke removal under 28 U.S.C. § 1442(a)(1).").

ExxonMobil claims the Baton Rouge facility was operated by Standard Oil "as a lessee of the government" (Notice of Removal ¶ 59), but it fails to attach the alleged lease. Instead, it asks this Court to infer the specifics of any such agreement by attaching a document that merely

1    references the *existence* of an agreement, dated July 9, 1942, between Standard Oil and the

2    Reconstruction Finance Corporation. Notice of Removal ¶ 60; Decl. Sestito, Ex. 15.

3        For the Baytown facility, ExxonMobil alleges that Humble Oil "contracted as agent [sic]"

4    with the federal government "to construct a synthetic rubber plant to produce butyl rubber"

5    Notice of Removal ¶ 56. ExxonMobil appears to rely on the May 18, 1942 "Agreement of

6    Lease." Decl. Sestito, Ex. 12. Under that agreement, ExxonMobil claims that the Baytown

7    Facility "produced hundreds of thousands of long tons of butyl rubber during the period of federal

8    government ownership." Notice of Removal ¶ 56. The provided lease, however, governs only the

9    construction of the plant. Decl. Sestito, Ex. 12, p. 1013527. While it "contemplated" that Humble

10   Oil and the federal government would "within six (6) months from the date hereof, enter into a

11   contract for the manufacture of Butyl Rubber in said plant," the lease itself did not govern the

12   production of rubber. *Id.* And, curiously, ExxonMobil did not include any such contract.

13       Absent the production contracts, the Court has no evidence to substantiate ExxonMobil's

14   claims regarding its historic relationship with the federal government, or to consider whether its

15   alleged predecessors' historic production of synthetic rubber could arise to the level of acting

16   under a federal officer. *See Watson.*, 551 U.S. at 156 (2007) (omission of underlying contract or

17   delegation of legal authority is "fatal" to claim of federal officer jurisdiction). Even if these

18   contracts were available for the court's review, ExxonMobil also provides no evidence to support

19   its critical assertion that the corporate signatories to these alleged contracts were its

20   "predecessors," that these contracts had any such continuing obligations or that ExxonMobil

21   expressly assumed the now defunct corporations' obligations, liabilities, and contractual

22   agreements when it merged in 1999.[4] *Cf. Honolulu*, 39 F.4th at 1109 (describing Standard Oil as

23   the "predecessor" to Chevron Corporation). Without these critical contracts and agreements,

24   ExxonMobil fails to even begin carrying its burden overcoming the "strong presumption against

25   removal jurisdiction." *Hansen*, 902 F.3d at 1057.

26   _____

27       [4] Fossil fuel industry defendants have repeatedly—and unsuccessfully—pointed to
     tangential government contacts from bygone eras to support federal officer jurisdiction. *See*
     *Honolulu*, 39 F.4th at 1113; *San Mateo*, 32 F.4th at 755; *City of Oakland*, 969 F.3d at 903.

28

16

### 2.    ExxonMobil did not act under the subjection, guidance, or control of a federal officer.

ExxonMobil claims that it was "acting under" the federal government through its "participation" in the wartime synthetic rubber industry—an industry it claims was created "at the direction of the federal government."[5] Notice of Removal ¶¶ 40, 64. Even if the federal government's relationship to Standard Oil and Humble Oil during World War II could be imputed to ExxonMobil, the degree of supervision and control described fails to meet the requisite standard. At most, any collaboration between the federal government and ExxonMobil is insufficient to demonstrate a "typical commercial relationship." *See* Notice of Removal ¶¶ 56-63.

In *Honolulu,* the Ninth Circuit squarely rejected federal officer jurisdiction for petrochemical company defendants, including ExxonMobil, under similar circumstances. Defendants first argued that they "acted under" federal officers by participating in the wartime effort to produce oil and gas during the Korean War. *Honolulu,* 39 F.4th at 1107. But "mere participation" in a government-directed program could not designate participants as agents of the government. *Id.* at 1108. They argued they acted under federal officers by leasing and operating a federally-owned oil reserve, which by contract required them to comply with certain government directives. *Id.* This too was insufficient because "payment under a commercial contract … does not involve close supervision or control." *Id.* at 1108. Third, defendants claimed their offshore oil leases were under the federal government's control because Congress "endorsed oil operations and considered making a national oil company." *Id.* Government oversight for such leases is still not enough to show "close direction." *Id.* at 1108. Not even an oil field "run jointly" by the Navy and Standard Oil, in which the Navy "had 'exclusive control' over the time and rate of exploration, and over the quantity and rate of production" could avail them of federal jurisdiction. *Id.* at 1109. These quotas constituted "general direction—not 'unusually close' supervision." *Id.*

---

[5] The lengthy history lesson concerning ExxonMobil's wartime manufacture of synthetic rubber is completely and bizarrely misplaced where the Complaint alleges consumer deception surrounding the recyclability of *plastics* – single use plastics specifically – and has nothing to do with synthetic rubber as will be discussed *infra* in the third prong of federal officer jurisdiction.

17

Under the standards set in *Honolulu*, the most that can be adduced from ExxonMobil's evidence is a typical commercial relationship between the federal government and the two facilities ExxonMobil identifies, for three reasons.

First, ExxonMobil's "participation" alone in the World War II government-funded synthetic rubber industry does not create grounds for federal officer jurisdiction. If it did, every company in any state court litigation that adjusted its production practices to contribute to the federal government's World War II efforts could meet the first prong for federal officer removal.

Second, the lessees operated the facilities under commercial agreements, under which they received payment and were subject to basic government directives. The "control" element that is crucial to ExxonMobil's argument comes from the alleged oversight of the "Rubber Reserve Company ("RRC") and Defense Plant Corporation ("DPC"). Notice of Removal ¶¶ 51-52, 56-57, 60. Under the Baytown Agreement ExxonMobil did provide, DFC was to acquire a site for the plant and fund its construction, and the lessee would in turn construct the plant. Decl. Sestito, Ex. 12, ¶¶ 1-2. The two reimbursement authorizations likewise show only that the RRC authorized subsequent repairs on at least one occasion each at the Baton Rouge and Baytown facilities, respectively. *Id.* at ¶¶ 56-60, Exs. 13 and 14 thereto.[6] "[T]he federal government's willingness to lease federal property or minimal rights to a private entity for that entity's commercial purposes does not, without more, constitute the kind of assistance required to establish that the private entity is 'acting under' a federal officer." *San Mateo*, 32 F.4th at 757.

Third, even if the Baytown and Baton Rouge facilities were constructed "under the auspices" of the DPC and "at the request" of the RRC, as ExxonMobil claims, this again amounts only to basic contractual oversight and involvement. Notice of Removal ¶ 49. A documented joint venture agreement and the federal government's ownership of property does not rise to the level

---

[6] The Notice of Removal contains contradictory statements about the federal ownership of the Baytown and Baton Rouge facilities. ExxonMobil claims both the Baytown and Baton Rouge facilities were "owned by the government." Notice of Removal ¶¶ 56, 59. Elsewhere, ExxonMobil observes that, unlike other synthetic rubber facilities from that period, private companies owned the Baytown and Baton Rouge facilities. ¶ 61 ("[T]he Baytown and Baton Rouge [petroleum] refineries… were owned by Humble and Standard Oil respectively"). Again, without the underlying contracts, the People have no way to verify these allegations, and ExxonMobil thus has not met its burden.

1    of "acting under" a federal officer. *San Mateo*, 32 F.4th at 757. Aside from the overall production

2    level of 20,000 tons of rubber set by the DPC, the lease contains no policies, procedures, or even

3    specifications dictating the means of that production, and thus the Standard Oil could act at its

4    discretion. Decl. Sestito, Ex. 12, ¶¶1-2. The lease does not claim to govern the production of

5    rubber at all. The lease further indemnified the federal government, holding it harmless against

6    any liability due to injuries to persons or property resulting from the plant's operations. *Id.* at ¶

7    15; *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 729 (9th Cir. 2015) (noting

8    that a company's independent-contractor status supported the conclusion that it was not acting

9    under a federal officer). Nor does the United States' enthusiasm for domestic rubber production

10   or its creation of a federal office show "close direction." Notice of Removal ¶¶ 41-19; *Honolulu*,

11   39 F.4th at 1108.

12        In sum, nothing in the lease agreement, the reimbursements, or the included history of

13   wartime rubber manufacture refers to a delegation of authority to ExxonMobil sufficient to show

14   it "acted under" a federal officer. And "neither Congress nor federal agencies normally delegate

15   legal authority to private entities without saying that they are doing so." *Watson*, 551 U.S. at 157.

16        As a last-ditch effort to substantiate its claims, ExxonMobil cites an unreported Texas

17   district court case for the proposition that the government exercised significant control over

18   synthetic rubber during World War II. Notice of Removal ¶¶ 61-63, (citing *Exxon Mobil Corp. vs.*

19   *United State*s, 2020 WL 5573048 at *6, 14 (S.D. Texas Sept. 16, 2020)). As discussed above,

20   whether a person "acted under" the federal government is a fact-specific inquiry, and support for

21   those facts is not in *this* record to support its "acting under" assertion.[7]

---

22        [7] To the extent ExxonMobil relies upon the findings in *ExxonMobil Corp. vs. United*
     *States*, 2020 WL 5573048 at *6, 14 (S.D. Texas Sept. 16, 2020), that case found only that, for
23   purposes of the Comprehensive Environmental Response, Compensation and Liability Act of
     1980, as amended, 42 U.S.C. § 9601 et seq. ("CERCLA"), the federal government was
24   responsible for its share of the remediation costs. *Id.* at *1. Under CERCLA, any owner within a
     property's chain of title may be held liable for all the costs to clean up contamination at a
25   property, regardless of whether they caused the contamination. 42 U.S.C. § 9607, subd. (a). Even
     if the federal government were a prior owner within a property's chain of title, and thus
26   responsible for costs under CERCLA, this does not equate to a finding that operations at that
     facility were under the "subjection, guidance, or control" of a federal officer.
27        Either way, the People are not subject to those factual findings under issue preclusion.
28   *Lambert v. Johnson*, 852 F.2d 1289 (9th Cir. 1988) (factual findings of prior court "inapplicable"
                                                                                      (continued...)

**B.    ExxonMobil Fails to Present a Colorable Federal Defense.**

In addition to failing to satisfy the "acting under" prong, ExxonMobil fails to satisfy the second prong of a "colorable federal defense" to support removal. *Honolulu*, 39 F.4th at 1110. The defense must arise out of the defendant's official duties. *Id.* In assessing whether asserted federal defenses are colorable, the Court should not consider Defendant's conclusory statements and general propositions of law as sufficient defenses. *Id.*

ExxonMobil repeats the same defenses that failed in *Honolulu*: First Amendment, preemption, and federal officer immunity defenses. The entirety of ExxonMobil's First Amendment and preemption argument is a single passing conclusory reference with no explanation. Notice of Removal ¶ 7. With no additional argument regarding the First Amendment or preemption, ExxonMobil has failed to satisfy its burden. *Honolulu,* 39 F.4th at 1110 ("Defendants' conclusory statements and general propositions of law do not make their defenses colorable."). Moreover, any preemption or First Amendment argument must arise from official duties. Here, ExxonMobil does not contend that the government ordered the deceptive conduct described in the Complaint. As in *Honolulu*, "Defendants do not contend that the government ordered their allegedly deceptive acts," and these defenses fail. *Id.* at 1110.

ExxonMobil's arguments regarding federal contractor immunity are conclusory and not supported by facts. The relevant three-part test regarding whether a defendant qualifies for the government contractor defense requires: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Tech. Corp*., 487 U.S. 500, 512-13 (1988). The government contractor defense is an affirmative one, so a defendant bears the burden of proof. *Leite v. Crane Co*., 868 F. Supp. 2d 1023, 1030 (D. Haw. 2012) (citing *Snell v. Bell Helicopter Textron, Inc*., 107 F.3d 744, 746 (9th Cir. 1997)).[8]

---

where "the parties and issues [a]re different.")

[8] While ExxonMobil relies on out of circuit authority, the Ninth Circuit has not adopted that authority and this Court should follow the test as articulated in *Boyle*. *See* Notice of Removal ¶¶ 78 – 82 (relying on *Baker v. Atl. Richfield Co*, 962 F.3d 937, 946 (7th Cir. 2020).

20

ExxonMobil argues it satisfied the federal contractor immunity defense by allegedly operating a government-owned plant to produce synthetic rubber for World War II. Notice of Removal ¶ 23-24. Under *Boyle*, the Defendant must show they were required to produce rubber to a precise specification, that the rubber conformed, and ExxonMobil warned the United States about the danger of synthetic rubber products. ExxonMobil makes no serious effort to establish any of these factors.

The only contract ExxonMobil provides is the lease to Humble Oil of the government's Baytown, Texas, plant. Decl. Sestito, Ex. 12 at 459. Other than the quantity of rubber expected from the plant ("approximately twenty thousand (20,000) long tons of such Butly Rubber") the lease is silent regarding conformity with precise specifications of the rubber. Instead, the lease concerns Humble Oil's assistance in the construction of the plant and "contemplate[s]" that Humble Oil will "within six (6) months from the date hereof, enter into a contract for the manufacture of Butyl Rubber in said plant." *Id*. ExxonMobil fails to attach any such contract.

For Standard Oil's operation of the Baton Rogue plant, ExxonMobil fails to provide any lease or contract whatsoever. Instead, ExxonMobil relies various government reports confirming that ExxonMobil's predecessors operated government plants that provided rubber to the government during World War II. *See* Notice of Removal ¶¶ 41–63. While these reports provide context (and repeatedly speak of "cooperation" between industry and government) they do not provide the contractual terms and information that would shed necessary light on Humble Oil's and Standard Oil's relationship with the federal government. This Court cannot find a colorable federal *contractor* defense without the applicable *contract*.[9]

/ / /

/ / /

/ / /

---

[9] ExxonMobil also provides evidence that capital improvements, like constructing a "General Separator," required government approval. Notice of Removal ¶ 60. As the federal government owned the properties and paid construction costs, that fact is not surprising. But approval of capital projects does not speak to government control regarding the operation of the plant producing synthetic rubber. ExxonMobil provides no contract that would speak to that relationship.

21

**C.    ExxonMobil Fails to Establish Any Causal Connection Between Consumer Deception and Rubber Production.**

Even if ExxonMobil had provided relevant contracts, under the third prong ExxonMobil fails to establish any causal connection—ExxonMobil's Notice is about synthetic rubber production during World War II and the Complaint alleges deceptive statements regarding plastics recycling decades later. *San Mateo*, 32 F.4th at 755; *accord Honolulu,* 39 F.4th at 1107. ExxonMobil's evidence regarding synthetic rubber production during World War II is completely unrelated to the time period, products, and claims alleged in the Complaint.

First, ExxonMobil alleges that its predecessors operated the Baytown and Baton Rouge plants from 1942 to 1955. Notice of Removal ¶¶ 50, 56. The federal government sold both the Baytown and Baton Rouge facilities in April and May of 1955 to Humble Oil and Standard Oil, respectively. Notice of Removal ¶ 55. The earliest deceptive conduct alleged in the Complaint begins in the 1970s.[10] Compl. ¶¶ 128-29 ("Exxon and Mobil promoted mechanical recycling as the answer to plastic waste and pollution in the 1970s but knew mechanical recycling was not a feasible method to handle most plastic waste."). ExxonMobil fails to plausibly argue that the deceptive conduct alleged in the Complaint beginning in the 1970s has any nexus with federal contracts (that were not provided) from the World War II era.

Second, ExxonMobil's argument rests on different products from the Complaint: butyl and butadiene to make synthetic rubber tires. Notice of Removal ¶ 37. There is no reference to butyl or butadiene or their production in the entirety of the Complaint. Nor does the Complaint reference rubber or synthetic rubber. Instead, the complaint references ethylene, polyethylene, and polypropylene—the building blocks for single-use plastics. E.g., Compl. ¶¶ 4, 15, 35, 36, 37, 194, 195, 199, 202, 244, 260, 287.

ExxonMobil attempts to manufacture a nexus to butyl and butadiene by referencing footnote 125 of the Complaint, the Complaint's sole reference to tires. Notice of Removal ¶¶ 37,

---

[10] The Complaint contains allegations of industry promoting plastics beginning in with a Life Magazine article and picture from August 1955, but does not allege industry deception until 1970s. Compl. ¶ 88. In any event, the federal government sold the Baytown and Baton Rouge facilities in April and May of 1955, prior to that advertisement. Notice of Removal ¶ 55.

22

73. The footnote states that ExxonMobil is "struggling to secure an adequate amount of plastic waste" for its Advanced Recycling operation, so has turned to "other types of non-single use plastic materials" including tires. Compl. ¶ 271 n.125. Whereas ExxonMobil claims that it can effectively recycle all kinds of single-use plastic, in reality, it cannot, and instead relies on non-single use materials (including tires) to hide the failures of Advanced Recycling from the public. *See* Compl. ¶ 267 ("Despite publicly promoting its 'advanced recycling' program as addressing our everyday residential plastic waste, ExxonMobil knows that such plastic waste is too contaminated, has too many additives that can harm refinery equipment, and is too compositionally and chemically variable to safely co-process in cokers and then steam crackers in large volumes.").[11] ExxonMobil's other references to tires in California's Complaint are similarly misplaced. *See* Notice of Removal ¶ 37 (citing Compl. ¶¶ 3, 70-74, none of which mention tires).

Third, ExxonMobil conflates the conduct at issue in the Complaint—consumer deception regarding the feasibility of plastics recycling—with the wartime sale of synthetic rubber over seventy years ago. Notice of Removal ¶ 39-64. Not only is the sale of synthetic rubber unrelated to the ethylene, polyethylene, and polypropylene production described in the Complaint, but ExxonMobil utterly fails to connect it to the Complaint's allegations, all of which stem from ExxonMobil's deceptions regarding the feasibility of plastic recycling. Compl. ¶¶ 85-350, 455-462. Finally, the Notice does not argue that ExxonMobil's, or its predecessors', deceptive advertisement of plastics to the public was under control of a federal officer.

In sum, ExxonMobil fails to establish any of the required elements under the federal officer removal statute.

///

///

///

---

[11] Moreover, ExxonMobil does not connect the synthetic rubber made during World War II with any tires processed in its own advanced recycling plant today.

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the foregoing reasons, the People respectfully request that the Court grant its motion to remand this action to the Superior Court of the State of California, County of San Francisco.

Dated:  December 9, 2024                          Respectfully submitted,

ROB BONTA
Attorney General of California
 DANIEL A. OLIVAS
Senior Assistant Attorney General
DENNIS L. BECK, JR.
Acting Senior Assistant Attorney General
VANESSA MORRISON
Supervising Deputy Attorney General


  /s/ Gabriel Martinez
GABRIEL MARTINEZ
STEPHANIE LAI
HALLIE KUTAK
LIZ RUMSEY
Deputy Attorneys General
*Attorneys for Plaintiff The People of the State of California ex rel. Rob Bonta Attorney General of California*

LA2024803779
91928397.docx

24