DAWN SESTITO (S.B. #214011)
dsestito@omm.com
MATTHEW R. COWAN (S.B. #281114)
mcowan@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 19th Floor
Los Angeles, California 90071-2899
Telephone:    (213) 430-6000
Facsimile:    (213) 430-6407

DAVID J. LENDER (*pro hac vice forthcoming*)
david.lender@weil.com
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
Telephone:    (212) 310-8153
Facsimile:    (212) 310-8007

*Counsel for Defendant Exxon Mobil Corporation*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, ex rel. ROB BONTA, ATTORNEY GENERAL OF CALIFORNIA,<br><br>     Plaintiff,<br><br>  v.<br><br>EXXON MOBIL CORPORATION; AND DOES 1 THROUGH 100, INCLUSIVE,<br><br>     Defendants. | Case No. 3:24-cv-07594-RS<br><br>**DEFENDANT EXXON MOBIL CORPORATION'S OPPOSITION TO MOTION TO REMAND**<br><br><u>Hearing</u><br><br>Date: February 13, 2025<br>Time: 1:30 p.m.<br>Location: Courtroom 3, 17th Fl.<br>Hon. Richard Seeborg |

1

**TABLE OF CONTENTS**

2

**Page**

3    I.    INTRODUCTION ................................................................................................. 1

4    II.    BACKGROUND ................................................................................................. 4

      A.    Factual Background ................................................................................. 4

5    B.    Procedural History ................................................................................. 7

6    III.    LEGAL STANDARDS......................................................................................... 7

7    IV.    ARGUMENT ...................................................................................................... 8

8    A.    Section 1441(a) Authorizes Removal Because This Court Has Original
            Jurisdiction .............................................................................................. 8

9          1.    Maritime Jurisdiction Under Section 1333 ................................. 8

10         2.    Federal Question Jurisdiction Under the Federal Enclave Doctrine......... 13

10    B.    Section 1442(a)(1) Authorizes Federal-Officer Removal.................................... 17

11         1.    The State's Evidentiary Arguments Fail to Negate Jurisdiction.............. 17

12         2.    The State's Legal Attacks on Each Element Fail..................................... 19

            a.    ExxonMobil Acted Under Federal Direction............................. 19

13         b.    ExxonMobil Raises a Colorable Federal Contractor Defense ...... 22

14         c.    ExxonMobil's Acts Under Federal Direction Relate to the
                  State's Claims .......................................................................... 24

15    V.    CONCLUSION .................................................................................................. 25

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S OPPOSITION TO MOTION TO REMAND
CASE NO. 3:24-CV-07594-RS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ali v. Rogers*,
    780 F.3d 1229 (9th Cir. 2015)..........................................................................3, 8, 11

*Allison v. Boeing Laser Tech. Servs.*,
    689 F.3d 1234 (10th Cir. 2012)...................................................................................13

*ARCO Env't Remediation, L.L.C. v. Dep't of Health and Env't Quality of Montana*,
    213 F.3d 1108 (9th Cir. 2000)....................................................................................15

*Arizona v. Manypenny*,
    451 U.S. 232 (1981).....................................................................................................17

*Azhocar v. Coastal Marine Servs., Inc.*,
    2013 WL 2177784 (S.D. Cal. May 20, 2013).............................................13, 14, 16

*Baker v. Atlantic Richfield Co.*,
    962 F.3d 937 (7th Cir. 2020)...........................................................................19, 23, 25

*Bell v. Arvin Meritor, Inc.*,
    2012 WL 1110001 (N.D. Cal. Apr. 2, 2012) .........................................................14, 16

*Betzner v. Boeing Co.*,
    910 F.3d 1010 (7th Cir. 2018).................................................................................17, 23

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988)...............................................................................................23, 24

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*,
    797 F.3d 720 (9th Cir. 2015).......................................................................................20

*California Sportfishing Prot. All. v. Shiloh Grp., LLC*,
    268 F. Supp. 3d 1029 (N.D. Cal. 2017) .....................................................................22

*Carter v. Bldg. Material & Constr. Teamsters' Union Local 216*,
    928 F. Supp. 997 (N.D. Cal. 1996) ...............................................................................1

*Christensen v. Georgia-Pac. Corp.*,
    279 F.3d 807 (9th Cir. 2002)........................................................................................11

*City & Cnty. of Honolulu v. Sunoco LP*,
    39 F.4th 1101 (9th Cir. 2022) ...............................................................................passim

*Cnty. of San Mateo v. Chevron Corp.*,
    32 F.4th 733 (9th Cir. 2022) ...........................................................................15, 20, 21

1

**TABLE OF AUTHORITIES**
(Continued)

2

Page(s)

3

*Dart Cherokee Basin Operating Co., LLC v. Owens,*
574 U.S. 81 (2014) ............................................................................................. 7

4

*Durham v. Lockheed Martin Corp.,*
445 F.3d 1247 (9th Cir. 2006)..................................................................... passim

5

6

*Earth Island Institute v. Crystal Geyser Water Co.,*
521 F. Supp. 3d 863 (N.D. Cal. 2021) ...................................................... 9, 10, 16

7

*Espinoza v. Princess Cruise Lines, Ltd.,*
581 F. Supp. 3d 1201 (C.D. Cal. 2022) ............................................................. 8

8

9

*Exxon Mobil Corp. v. United States,*
108 F. Supp. 3d 486 (S.D. Tex. 2015) ............................................................ 22

10

*Exxon Mobil Corp. v. United States,*
2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) .......................................... 18, 22

11

12

*Exxon Mobil Corp. v. United States,*
No. 4:10-cv-02386 (S.D. Tex. Sept. 30, 2013) ............................................... 18

13

14

*ExxonMobil Corp. v. Allapattah Servs., Inc.,*
545 U.S. 546 (2005)................................................................................. 7, 8, 14

15

16

*Foremost Ins. Co. v. Richardson,*
457 U.S. 668 (1982)......................................................................................... 10

17

*Fung v. Abex Corp.,*
816 F. Supp. 569 (N.D. Cal. 1992) ................................................................... 15

18

19

*Goncalves By and Through Goncalves v. Rady Children's Hospital San Diego,*
865 F.3d 1237 (9th Cir. 2017)...................................................................... 19, 24

20

21

*Gruver v. Lesman Fisheries Inc.,*
489 F.3d 978 (9th Cir. 2007)........................................................................ 10, 11

22

23

*Hansen v. Group Health Cooperative,*
902 F.3d 1051 (9th Cir. 2018) .......................................................................... 17

24

*In re Blue Water Boating, Inc.,*
786 F. App'x 703 (9th Cir. 2019) ....................................................................... 9

25

26

*In re Commonwealth's Motion to Appoint Counsel,*
790 F.3d 457 (3d Cir. 2015)............................................................................... 24

27

28

- iii -

1

**TABLE OF AUTHORITIES**
(Continued)

2

Page(s)

3

*In re Garrett*,
    981 F.3d 739 (9th Cir. 2020).............................................................. 9, 10

4

5

*In re Mission Bay Jet Sports, LLC*,
    570 F.3d 1124 (9th Cir. 2009)............................................................. 8, 9

6

7

*Isaacson v. Dow Chemical Co.*,
    517 F.3d 129 (2d Cir. 2008).......................................................... 19, 20, 21

8

*Jackson v. Avondale Indus. Inc.*,
    469 F. Supp. 3d 689 (E.D. La. 2020) ...................................................... 23

9

10

*Jamil v. Workforce Res., LLC*,
    2018 WL 2298119 (S.D. Cal. May 21, 2018) ............................................. 14

11

*Janis v. Health Net, Inc.*,
    472 F. App'x 533 (9th Cir. 2012) .......................................................... 18

12

13

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
    513 U.S. 527 (1995)................................................................. 10, 11, 12

14

15

*Jones v. LA Cent. Plaza LLC*,
    74 F.4th 1053 (9th Cir. 2023) ............................................................. 16

16

*Kohlasch v. New York State Thruway Auth.*,
    460 F. Supp. 956 (S.D.N.Y. 1978) ......................................................... 12

17

18

*Legg v. Wyeth*,
    428 F.3d 1317 (11th Cir. 2005).............................................................. 7

19

20

*Leite v. Crane Co.*,
    749 F.3d 1117 (9th Cir. 2014)........................................................ passim

21

*Machnik v. Buffalo Pumps Inc.*,
    506 F. Supp. 2d 99 (D. Conn. 2007) ....................................................... 23

22

23

*Moreno v. Ross Island Sand & Gravel Co.*,
    2015 WL 5604443 (E.D. Cal. Sept. 23, 2015) .............................................. 9

24

25

*Papp v. Fore-Kast Sales Co.*,
    842 F.3d 805 (3d Cir. 2016)............................................................... 19

26

*People v. Selby Smelting & Lead Co.*,
    163 Cal. 84 (1912) ........................................................................ 9

27

28

DEFENDANT'S OPPOSITION TO MOTION TO REMAND
CASE NO. 3:24-CV-07594-RS

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Pizarro v. Astra Flooring Co.*,
    444 F. Supp. 3d 1146 (N.D. Cal. 2020) ........................................................... 23, 24

*Powell v. McCormack*,
    395 U.S. 486 (1969) ........................................................................................... 7, 15

*Ruppel v. CBS Corp.*,
    701 F.3d 1176 (7th Cir. 2012) .................................................................. 19, 20, 23

*Salter v. Quality Carriers, Inc.*,
    974 F.3d 959 (9th Cir. 2020) ................................................................................ 18

*Shapiro v. Lundahl*,
    2017 WL 2902799 (N.D. Cal. July 7, 2017) .......................................................... 9

*State of New Mexico v. Monsanto*,
    454 F. Supp. 3d 1132 (D.N.M. 2020) ................................................................... 16

*Stirling v. Minasian*,
    955 F.3d 795 (9th Cir. 2020) ................................................................................ 23

*Taghadomi v. United States*,
    401 F.3d 1080 (9th Cir. 2005) ................................................................................ 8

*Tobar v. United States*,
    639 F.3d 1191 (9th Cir. 2011) ....................................................................... passim

*Totah v. Bies*,
    2011 WL 1324471 (N.D. Cal. Apr. 6, 2011) ................................................... 14, 16

*United States v. City of Redwood City*,
    640 F.2d 963 (9th Cir. 1981) ................................................................................ 12

*Walton v. Channel Star Excursions, Inc.*,
    2007 WL 763299 (E.D. Cal. Mar. 9, 2007) ............................................................ 9

**Statutes**

28 U.S.C. § 1367(a) .................................................................................................... 7

28 U.S.C. § 1442(a)(1) .......................................................................................... 3, 16

9 U.S.C. § 1 ............................................................................................................... 12

Cal. Bus. & Prof. Code § 17200 ................................................................................ 6

- v -

1

**TABLE OF AUTHORITIES**
(Continued)

2

**Page(s)**

3   Cal. Bus. & Prof. Code § 17500 ........................................................................ 6

4   Cal. Bus. & Prof. Code § 17580.5 ..................................................................... 6

5   Cal. Fish & Game Code § 5650 ........................................................................ 6

6   Cal. Fish & Game Code § 5650(a)(6) .............................................................. 12

7   Cal. Fish & Game Code § 5650.1 ..................................................................... 6

8   Cal. Gov. Code § 12607 .................................................................................... 6

9   Cal. Pub. Res. Code § 14500 *et seq.* ................................................................ 4

10  Cal. Pub. Res. Code § 14547 ............................................................................ 1

11  Cal. Pub. Res. Code § 18000 ............................................................................ 1

12  Cal. Pub. Res. Code § 18015 ............................................................................ 1

13  Cal. Pub. Res. Code § 18017 ............................................................................ 1

14

15  Cal. Pub. Res. Code § 41780.01 ....................................................................... 1

16  Cal. Pub. Res. Code § 42649 ............................................................................ 1

17  Cal. Pub. Res. Code § 42649.2 ......................................................................... 1

18  Cal. Pub. Res. Code § 42924.5 ......................................................................... 1

19  Cal. Pub. Res. Code § 14500 *et seq.* ................................................................ 1

20  Cal. Pub. Res. Code § 40000 *et seq.* ................................................................ 1

21  Cal. Pub. Res. Code § 42300 *et seq.* ................................................................ 1

22  Cal. Water Code § 13050(e) .............................................................................. 9

23

24

25

26

27

28

- vi -

1    I.    **INTRODUCTION**

2         For decades, the State of California has encouraged people to recycle.[1]  Recycling, the

3    State explained, was "the most promising method of controlling the increasing amounts of

4    plastics in the waste stream," because "[c]ontrary to popular belief, most plastics are technically

5    recyclable."[2]  California has legislated to encourage or mandate plastic recycling since the 1980s.[3]

6    And it has itself promoted the use of plastic because "[p]lastics are integral to our lifestyle and

7    economy, and they have societal benefits due to their light weight and versatile range of

8    applications,"[4] "contribut[ing] to our health, safety, and peace of mind in endless beneficial

9    ways."[5]  All of these statements and more have been in support of a firm public policy to

10   "encourage[] through broad educational and promotional resin efforts" the "[u]se of recycled plastics."[6]

11        Yet now, the California Attorney General is suing Exxon Mobil Corporation

12   ("ExxonMobil") for saying the same things, as it seeks to hold ExxonMobil solely responsible for

13   "the plastic waste and pollution crisis."  Compl. ¶ 1.  Its theory is that decades-old statements

14   (mostly made by entities other than ExxonMobil) to a global audience about the benefits and

15   recyclability of plastics, along with ExxonMobil's current advanced recycling operations in

16   _____

17   [1] ExxonMobil does not waive, and expressly preserves, its right to challenge personal jurisdiction
     with respect to this action.  *See, e.g.*, *Carter v. Bldg. Material & Constr. Teamsters' Union Local*

18   *216*, 928 F. Supp. 997, 1000-01 (N.D. Cal. 1996).

19   [2] Ex. A at 1. Citations to "Ex." refer to the concurrently filed declaration of Dawn Sestito.

20   [3] *See, e.g.*, Cal. Pub. Res. Code § 14500 *et seq.* (California Beverage Container Recycling and
     Litter Reduction Act of 1986 (AB 2020)); *id.* § 40000 *et seq.* (California Integrated Waste

21   Management Act of 1989 (AB 939)); *id.* § 42300 *et seq*. (Rigid Plastic Packaging Container Act
     of 1991); *id.* § 18000 (AB 3299) (1988 law requiring resin identification label); *id.* § 41780.01

22   (AB 341) (2011 law setting percent of solid waste goal that "75 percent of solid waste generated
     be source reduced, recycled, or composted by the year 2020, and annually thereafter"); *id.*

23   § 42649 (AB 341) (2012 law mandating commercial recycling); *id.* § 42924.5 (AB 2812) (2017
     law requiring state agencies and facilities to facilitate recycling onsite); *id.* § 42649.2 (AB 827)

24   (2019 Customer Access to Recycling law for businesses); *id.* §§ 14547, 18017 (AB 793) (2020
     law establishing plastic recycling content standards); *id.* § 18015 (SB 343) (2022 law requiring

25   certain labeling and coding of rigid plastic bottles and containers).

26   [4] Ex. B at 1; *see also id.* at 5, 7.

27   [5] Ex. B at 5; *see also id.* at 7.

28   [6] Ex. A at 53.

Texas, somehow tricked California consumers into (a) believing that all "plastics were recyclable," (b) buying more plastic products, and ultimately, (c) polluting the environment with plastic litter, "harming California's iconic coastlines, waterways, wildlife, and residents." *See id.* ¶¶ 3, 85, 211.

That theory is hard to believe. Far from being the sole cause of global plastic pollution, ExxonMobil has invested funds to help resolve this multifaceted problem. For example, ExxonMobil's advanced recycling facility in Baytown, Texas, converts plastic waste—including hard-to-recycle plastic like bags, films, and polystyrene foam—into molecular building blocks, which then become the raw material for new products, including fuels, lubricants, and plastics. *See* Compl. ¶¶ 244-47. Advanced recycling technologies increase circularity, both by diverting plastic waste from landfills and the environment, and by helping users of plastic such as packaging manufacturers, beverage companies, and restaurants work toward their sustainability goals.[7] The State may not think ExxonMobil's new recycling technologies suffice "to solve the plastic waste and pollution crisis" by themselves (though the State, too, has promoted similar technologies in the past),[8] *id.* ¶ 51. But ExxonMobil did not assume liability for global pollution by innovating solutions to the problem.

The question now before this Court, however, is simply *who* decides whether the State's claims that one company should be held responsible for the global effects of plastic pollution have merit. The answer must be a federal court. That conclusion follows inevitably from the Complaint the State filed. The State attempts to characterize this case as a "straightforward enforcement action" against alleged "consumer deception" that belongs in state court. Dkt. 19 at 2-3. But this is far from a routine consumer-protection case, as the State's own complaint makes clear. The State brings suit in part based on harms to navigable waters and federal enclaves and seeks as relief an order to clean them up. *See* Compl. ¶¶ 444, 454; *id.* ¶¶ 463, 474. This case thus

---

[7] *See* ExxonMobil, *Advanced recycling technology*, https://corporate.exxonmobil.com/what-we-do/materials-for-modern-living/advanced-recycling-technology.

[8] *See* Ex. C at 18.

implicates uniquely federal interests, and for this reason alone belongs in federal court, no matter the state-law statute giving rise to the State's claims.

Faced with those jurisdictional consequences, the State now tries to furiously backpedal from the environmental-remediation Complaint it filed. The State claims that its broad allegations that ExxonMobil is responsible for statewide water pollution—including over 80 "marine" allegations—serve to "merely set the scene" or "illustrate the breadth of crisis," without supporting federal jurisdiction. Dkt. 19 at 8, 13. But the State cannot have it both ways: It cannot blame ExxonMobil for global plastic pollution while simultaneously disclaiming harm caused by that pollution to deprive ExxonMobil of its statutory right to a federal forum.

The State's expansive Complaint gives rise to federal court jurisdiction in three ways. First, the Court has original maritime jurisdiction over the State's attempt to hold ExxonMobil liable for global marine plastic pollution, including in California's "oceans, seas, rivers and lakes." Compl. ¶ 60. Original maritime jurisdiction has three elements: the alleged tort must have (1) taken place on navigable water, (2) "a potentially disruptive impact on maritime commerce," and (3) a "substantial relationship to traditional maritime activity." *Ali v. Rogers*, 780 F.3d 1229, 1235 (9th Cir. 2015). Here, (1) California's oceans, seas, rivers, and lakes are "navigable waters"; (2) the State has alleged disruptions to maritime commerce, including commercial fishing, Compl. ¶ 374; *id.* ¶ 390-91; and (3) acts of alleged marine pollution, such as the State's claim under the Fish and Game Code, constitute a traditional maritime tort, providing the requisite relationship to traditional maritime activity.

Second, this Court has federal question jurisdiction because the State's claims arise on federal enclaves. The Complaint alleges harm to all of California's "waterways" and "shorelines," many of which are lined with federal enclaves, including coastal military bases. *Id.* ¶¶ 60, 81, 373-74. Federal law governs all claims arising out of harm occurring on those federal enclaves.

Third, this Court has jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof … for or relating to any act under color

- 3 -

1  of such office."  The claims against ExxonMobil relate to its past acts under color of federal

2  officers in developing and producing wartime synthetic rubber, including for tires in California,

3  which now contribute to the modern-day plastic pollution underlying the State's claims.  And

4  ExxonMobil has a colorable federal contractor defense to liability for that conduct.

5       Any one of these three jurisdictional bases suffices to support removal jurisdiction here.

6  This Court should deny the motion to remand.

7  **II.    BACKGROUND**

8       **A.    Factual Background**

9       ExxonMobil is a Texas-headquartered, New Jersey corporation that sells plastic resin

10  pellets to other companies, which transform that plastic resin into finished products.  ExxonMobil

11  does not sell plastic resin pellets to consumers in California or elsewhere.

12       For more than a half-century, plastics, recycling, and pollution have been topics of

13  widespread debate nationwide—including in California.  The State of California has been

14  legislating on these issues since the 1980s, and specifically "recommend[ed] avoiding legislation

15  that ban plastics" in the 1990s.[9]  The Complaint alleges that ExxonMobil and other industry

16  members exercised their First Amendment rights to participate in this public dialogue and to

17  petition for reasonable regulations by sharing their perspectives on these issues with policymakers

18  and the public.[10]  ExxonMobil has explained, for example, how plastic products help grow and

19  preserve food, deliver clean drinking water, protect against disease, and build our computers,

20  mobile phones, and vehicles—often with a lower carbon footprint than alternative materials like

21  paper, aluminum, and glass.[11]  Over the years, the State, too, has publicly acknowledged these

22  comparative benefits of plastic, noting the "fuel efficiency" of vehicles made with "light and

23

24  _____

25  [9] *See, e.g.*, Cal. Pub. Res. Code § 14500 *et seq.* (Beverage Container Recycling and Litter Reduction Act of 1986); *supra* note 3 (collecting citations); Ex. A at 4.

26  [10] *See* Compl. ¶¶ 125, 253, 279.

27  [11] Karen McKee, *How we're helping meet the plastic waste challenge*, EXXONMOBIL.COM, https://corporate.exxonmobil.com/news/viewpoints/helping-meet-the-plastic-waste-challenge?print=true.

28

strong" plastics, as well as the "significant source reduction benefits" of plastic packaging.[12]

Notably, the State has also advocated recycling as an important strategy to address plastic-related pollution. Indeed, the State launched an extensive, years-long educational campaign to promote plastic recycling, telling Californians that "recycling eliminates the need to build landfills, saves energy, reduces greenhouse gas emissions, reduces air pollution and water pollution, conserves forests, and has twice the economic impact of disposal while generating $10 billion worth of taxable economic activity each year…!"; the State also predicted that recycling's benefits would "include increased employment, corporate taxes, and sales taxes from domestic reprocessors and plastic product manufacturers who use recycled plastics."[13] Since the 1990s, according to the State, "[r]ecycling … [has] formed the core of California's waste diversion efforts" (along with "composting"), providing "effective waste diversion approaches that can be implemented immediately."[14] The State previously extolled and funded not only "mechanical" plastic recycling, but also "chemical recycling" (or "advanced recycling," Compl. ¶¶ 244, 251), describing it as "'cutting-edge' technology with "significant long-term potential."[15]

And today, California's cities and counties are responsible for waste management under the oversight of a state agency called "CalRecycle." That State agency continues to advocate "bring[ing] together the state's recycling and waste management programs" to work toward a

---

[12] *Compare id. with* Ex. B at 7 ("In automobiles and other transportation applications, plastic resins are both light and strong, allowing for vehicles with increased fuel efficiency"); *id.* ("In packaging, plastics offer significant source reduction benefits, reducing the amount of material needed to supply a product while maintaining the functions provided by packaging."); *id.* ("Plastics play a significant role in reducing the amount of waste ultimately sent to landfills. The weight-reducing benefits of many plastics can offset the higher recycling rates of other materials.").

[13] Ex. D at 51; *see also, e.g.*, Ex. E at 37 (establishing Plastics Recycling Information Clearinghouse to "develop public interest for recycling plastics"); Ex. F at 19 ("PET plastic can be recycled into clothing, fiberfill for sleeping bags, stuffed animals, toys, rulers, and more!"); Ex. G ("Of course with recycling, there's no such thing as too much of a good thing."); Ex. J ("Plainly, recycling is more important than ever. Fortunately, doing the right thing is easy–and it can make you money.").

[14] Ex. E at 19.

[15] Ex. C at 18.

1  society "that uses less, recycles more, and takes resource conservation to higher and higher

2  levels."[16]  CalRecycle tracks statewide waste management data, including plastics recycling

3  efforts over the past decades, as well as any "difficult[y]" and "expens[e]" of "sorting," "[q]uality

4  issues," and other "barriers [that] ha[d] become clear through many studies."[17]  The State of

5  California—and not ExxonMobil—therefore had the best information about whether plastics

6  recycling was successful or not.[18]  The State was never "deceived" about any shortcomings of

7  recycling—it had superior knowledge all along.

8          Some of ExxonMobil's policy positions are at odds with the State's current

9  administration, which seeks to minimize (or even eliminate) plastics and advanced recycling

10  technologies.  This lawsuit takes direct aim at ExxonMobil's speech and advocacy on these

11  issues.  The Complaint alleges ExxonMobil engaged in a "campaign" to influence public opinion

12  on plastics and related regulations, including by encouraging the public to recycle—even though

13  the State has itself promoted recycling for decades.  *See* Compl. ¶ 5; *supra* at 1, 5.  The State

14  further alleges that ExxonMobil's statements are to blame for statewide plastic pollution, and

15  specifically, "marine pollution" to "California's iconic coastlines" and "oceans."  *See id.* ¶¶ 3, 6,

16  222.  Based on those allegations, the State asserts six causes of action: (1) public nuisance (*id.*

17  ¶¶ 423-39); (2) equitable relief for pollution, impairment, and destruction of natural resources,

18  Cal. Gov. Code § 12607 (*id.* ¶¶ 440-48); (3) "Water Pollution," Cal. Fish & Game Code §§ 5650,

19  5650.1 (*id.* ¶¶ 449-54); (4) untrue or misleading advertising, Cal. Bus. & Prof. Code § 17500 (*id.*

20  ¶¶ 455-57); (5) misleading environmental marketing, Cal. Bus. & Prof. Code § 17580.5 (*id.*

21  ¶¶ 458-60); and (6) unfair competition, Cal. Bus. & Prof. Code § 17200 (*id.* ¶¶ 461-62).

22          The Attorney General is litigating this Complaint in coordination with a consortium of

23  non-governmental organizations, which filed suit the same day.  *Sierra Club, Inc., et al. v.*

24  ───────────────

25  [16] Ex. I.

   [17] Ex. A at 12, 34, 63.

26  [18] *See, e.g.*, Ex. J at 34 ("CalRecycle administers and provides oversight for all of California's

27  state-managed non-hazardous waste handling and recycling programs."); Ex. K at 3 (data
   including "snapshot of the state's waste management and recycling goals and progress, as well as

28  CalRecycle's efforts and new initiatives in 2020.").

DEFENDANT'S OPPOSITION TO MOTION TO REMAND
CASE NO. 3:24-CV-07594-RS

1    *ExxonMobil Corp.*, *et al.*, No. 3:24-cv-7288-RS (N.D. Cal.), Dkt. 1-1.

2        **B.        Procedural History**

3        The State filed the Complaint in the California Superior Court, San Francisco County, on

4    September 23, 2024.  On October 4, 2024, the State served ExxonMobil, and ExxonMobil timely

5    removed on November 1, 2024, invoking federal jurisdiction under 28 U.S.C. §§ 1331, 1333,

6    1441, and 1442.  Dkt. 1 ("NOR").  On December 9, 2024, the State moved to remand.  Dkt. 19.

7    **III.    LEGAL STANDARDS**

8        "The removal process was created by Congress to protect defendants."  *Legg v. Wyeth*,

9    428 F.3d 1317, 1325 (11th Cir. 2005).[19]  "[A] defendant seeking to remove a case to a federal

10   court must file in the federal forum a notice of removal 'containing a short and plain statement of

11   the grounds for removal.'"  *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87

12   (2014).  Federal jurisdiction over any one claim supports removal of the entire action, because

13   district courts have supplemental jurisdiction over related claims.  28 U.S.C. § 1367(a).

14   *ExxonMobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 563 (2005).

15       Here, the particular bases for federal jurisdiction and removal that ExxonMobil invokes

16   are each "interpreted broadly" in favor of federal jurisdiction.  *See Tobar v. United States*, 639

17   F.3d 1191, 1198 (9th Cir. 2011) (discussing nexus requirement for maritime jurisdiction);

18   *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) (federal enclave

19   jurisdiction applies when some but not all torts occurred on federal enclaves); *id.* at 1252 (courts

20   "interpret section 1442 broadly in favor of removal"); *see also Powell v. McCormack*, 395 U.S.

21   486, 515 (1969) (Section 1331 is a "broad jurisdictional grant").

22

23

24

25

26

27

28

---

[19] Unless otherwise noted, all emphases are added, and all internal citations, quotation marks, and alterations are omitted.

1  **IV.    ARGUMENT**

2       **A.    Section 1441(a) Authorizes Removal Because This Court Has Original
3              Jurisdiction**

4           **1.    Maritime Jurisdiction Under Section 1333**

5           This Court has original maritime jurisdiction under 28 U.S.C. § 1333.  *See* NOR ¶¶ 11-24.

6   Maritime jurisdiction applies when three elements are met: the alleged harm (a) "t[ook] place on

7   navigable water" ("location"), (b) had "a potentially disruptive impact on maritime commerce"

8   ("disruptive impact"), and (c) had a "substantial relationship to traditional maritime activity"

9   ("maritime relationship").  *Ali*, 780 F.3d at 1235.  All three elements are satisfied here, despite the

10  State's artful attempt to disclaim its many allegations of maritime harm.

11          **(a) Location.**  This element asks "whether the tort occurred on navigable water."  Dkt. 19

12  at 6 (quoting *In re Mission Bay Jet Sports, LLC*, 570 F.3d 1124, 1126 (9th Cir. 2009)).  In

13  applying that test, "[t]he situs of a tort for the purpose of determining admiralty jurisdiction is the

14  place *where the injury occurs*."  *Taghadomi v. United States*, 401 F.3d 1080, 1084 (9th Cir.

15  2005.  It does not matter whether defendant's "actions (or failure to act) took place entirely on

16  land." *Id.*; *see Tobar*, 639 F.3d at 1197 ("[T]his rule that the place where the injury occurs

17  controls holds even when some of the negligent activity occurs on land.").  Nor does it matter

18  whether the *entire* injury occurs on navigable waters; as long as part of the injury occurs on

19  navigable waters, the location element is met.  *See, e.g., Espinoza v. Princess Cruise Lines, Ltd.*,

20  581 F. Supp. 3d 1201, 1210 (C.D. Cal. 2022) (jurisdiction proper even when some of the damage

21  from the alleged tortious act "occurred on land").[20]

22          Here, the Complaint alleges injuries that "occur[red] on navigable water"—i.e., waters

23  forming "a continued highway over which commerce is or may be carried on with other States or

24  foreign countries."  *In re Garrett*, 981 F.3d 739, 741 (9th Cir. 2020).  Consider the nuisance

25

26  ---
    [20] If at least one claim alleges an injury occurring on navigable water, that suffices for
    jurisdiction, even if some other claims allege injuries that occurred solely on land or otherwise
27  fail the three-element test for maritime jurisdiction.  As long as the court has maritime jurisdiction
    over at least one claim, it also has supplemental jurisdiction over the remaining claims.
28  *Allapattah*, 545 U.S. at 563.

claim:  The "situs" of the alleged injury—or "where the nuisance exists," *People v. Selby*

*Smelting & Lead Co.*, 163 Cal. 84, 95 (1912)—allegedly encompasses all of California's

"waterways," i.e., "oceans, seas, rivers and lakes," which are navigable.  Compl. ¶¶ 60, 360; *see*

*also* NOR ¶ 12, 13 (collecting allegations about marine environments).  Similarly, the "Water

Pollution" claim is a type of "maritime tort" where "the injury occurs" on water.  Compl. ¶¶ 449-

54; *see Shapiro v. Lundahl*, 2017 WL 2902799, at *4 (N.D. Cal. July 7, 2017) (situs test for

maritime torts).  Both claims satisfy the location test.

    The State argues that "the Complaint expressly disclaims any injuries arising on federal

lands," and seeks relief only for harms "within California's geographical boundaries."  Dkt. 19 at

7 (citing Compl. p.7 n.1).  But there are "navigable waters" indisputably located within

California's geographical boundaries.  *Mission Bay*, 570 F.3d at 1127 (majority of Mission Bay,

"as well as the Pacific Ocean," are navigable waterway); *see also In re Blue Water Boating, Inc.*,

786 F. App'x 703, 704 n.2 (9th Cir. 2019) (Santa Barbara Harbor "is a body of navigable water");

*Walton v. Channel Star Excursions, Inc.*, 2007 WL 763299, at *2 (E.D. Cal. Mar. 9, 2007)

(Sacramento River); *Moreno v. Ross Island Sand & Gravel Co.*, 2015 WL 5604443, at *16 (E.D.

Cal. Sept. 23, 2015) (San Joaquin River).  Many of the State's "rivers, lakes, bays, and ocean

waters," Compl. ¶ 360, are "accessible for trade or travel," and not completely "enclosed []or

obstructed" from interstate commerce.  *Mission Bay*, 570 F.3d at 1127.  Accordingly, the State's

sweeping nuisance and "Water Pollution" claims, seeking an order to clean "substance[s]" from

virtually all "waters of the State," unavoidably allege injuries arising on navigable rivers, lakes,

and bays for maritime jurisdiction purposes.  *E.g.*, Compl. ¶ 454; *id.* ¶ 474.[21]

    The State also relies on *Earth Island Institute v. Crystal Geyser Water Co.*, 521 F. Supp.

3d 863 (N.D. Cal. 2021).  That case recognized the "clear law" above, explaining that "[f]or the

purpose of determining admiralty jurisdiction, the tort is deemed to occur, not where the wrongful

act or omission has its inception, but where the impact of the act or omission produces such injury

---

[21] California defines "waters of the state" as "any surface water or ground water, including saline
waters, within the boundaries of the state."  Cal. Water Code § 13050(e).  That definition
indisputably encompasses navigable waters.

as to give rise to a cause of action." *Id*. at 880.  To the extent it concluded that pleading "torts occurring in California waterways and coasts, rather than oceanic waters, navigable waters of the United States, federal enclaves, or the waters of multiple states" excluded torts on navigable waters, *id.*, it is irreconcilable with the Ninth Circuit law above and should be rejected.

**(b) Disruptive Impact.**  The second maritime prong requires that the alleged tort have a "potentially disruptive impact on maritime commerce." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995).  Here, the State pleaded an *actual, direct* effect on commercial fishing.  Compl. ¶ 374 (plastic litter "affects a substantial number of people who use California waterways for commercial and recreational purposes"), ¶ 390 (plastic pollution "interfere[s] with California's commercial and recreational fishing and boat navigation"), ¶ 391 ("[P]lastic waste and pollution negatively impacts fish populations that California's fishing economy depends upon.").  And commercial fishing is quintessential maritime commerce.  *See Gruver v. Lesman Fisheries Inc.*, 489 F.3d 978, 982-83 (9th Cir. 2007) (fight aboard a commercial fishing ship could disrupt commercial maritime activity); *Tobar*, 639 F.3d at 1197 (same, where Coast Guard towed a commercial fishing boat); *Emerson G.M. Diesel, Inc. v. Alaskan Enter.*, 732 F.2d 1468, 1472 (9th Cir. 1984) ("[I]t is well settled that fishing vessel owners and commercial fishermen may recover for lost fishing profits under the general maritime law of negligence." (collecting cases about commercial fishing)), *abrogated on other grounds by E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986).

The State concedes that the Complaint "references commercial fishing," but nonetheless claims this element is not satisfied because the harms detailed in the Complaint do not involve "the business of shipping."  Dkt. 19 at 8-9.  But that narrow conception of maritime jurisdiction has been rejected by the Supreme Court.  *See Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 674-75 (1982) (rejecting notion that a connection to "commercial maritime activity" or "shipping" is necessary to invoke maritime jurisdiction).  Instead, the federal interest underlying maritime jurisdiction extends to "noncommercial maritime activity," given its "potential effect … on maritime commerce."  *Id*. at 675; *see Garrett*, 981 F.3d at 742 (recognizing that "maritime jurisdiction can extend to recreational boating").  The State also notes that its commercial fishing

- 10 -

1   allegations fall only "under the section titled 'ExxonMobil Substantially Caused and Is Causing

2   Plastic Waste and Pollution That Harm *California's Local Coastal Economies*.'" Dkt. 19 at 9

3   (emphasis in original) (quoting Compl. at p. 125). But it is unclear why the State thinks the

4   italicized clause matters, as California's local economies include commercial fishermen who use

5   the State's navigable waters. The State has alleged actual disruptions to commercial fishing that

6   harm California's economy.[22] That is more than enough to satisfy the second prong.

7        **(c) Maritime Relationship.**  The third prong of maritime jurisdiction requires a

8   "substantial relationship" between the challenged conduct and "traditional maritime activity."

9   *Gruver*, 489 F.3d at 982. The substantial-relationship connection is also "interpreted broadly."

10  *Tobar*, 639 F.3d at 1198. The Court "look[s] at a tort claim's general features, rather than at its

11  minute particulars, to assess whether there is the requisite connection." *Ali*, 780 F.3d at 1235.

12       The substantial relationship analysis proceeds in two steps. "[A]s a first step," courts

13  "define what constitutes the activity giving rise to the incident." *Gruver*, 489 F.3d at 983. Then,

14  "[the] next task is to determine how broadly or narrowly to characterize the [relevant] dispute for

15  the purposes of the comparison to traditional maritime activity." *Id.* at 985. This inquiry turns on

16  whether the activity "is so closely related to activity traditionally subject to admiralty law that the

17  reasons for applying special admiralty rules would apply in the suit at hand." *Grubart*, 513 U.S.

18  at 539-40.

19       At the first step, the State has alleged (including under its "Water Pollution" claim) that

20  ExxonMobil's conduct "permitted to pass into the waters of the State [a] substance or materials

21  deleterious to fish, plant life, mammals, or bird life"—namely, "plastic waste." Compl. ¶¶ 450,

22  453-54. The State's nuisance claim likewise alleges that ExxonMobil "created, caused,

23  contributed to, and assisted in creating harmful plastic pollution throughout California," including

24  in navigable waters. *Id.* at ¶¶ 426-27; *see supra* at 8-9. That is, it broadly alleges that

---

26  [22] Even if the State had not pleaded an actual impact on commercial fishing, the second element is
27  satisfied because maritime jurisdiction requires no more than "potential" or "hypothetical"
    impacts on maritime commerce. *See Christensen v. Georgia-Pac. Corp.*, 279 F.3d 807, 815 n.31
28  (9th Cir. 2002).

1    ExxonMobil's conduct caused pollution to California's navigable waterways through its

2    production of plastic resin and allegedly "decepti[ve]" statements.  *See, e.g.*, Compl. ¶ 389.

3         The second step considers how this alleged activity compares to "traditional maritime

4    activity."  Here, the comparison yields a perfect match.  ExxonMobil's supposed maritime

5    pollution of California's navigable waters is not just "closely related" to traditional maritime

6    activity and special admiralty rules, *Grubart*, 513 U.S. at 539-40—it corresponds exactly with the

7    traditional maritime activity of pollution-based maritime torts.  Special maritime torts are

8    paradigmatic examples of activities for which "special admiralty rules" were created in the first

9    place.  *Id.* at 539.  Courts have thus long held that maritime "pollution in navigable waters"

10   constitutes a "maritime tort," and such alleged torts constitute traditional maritime activity

11   regulated by special admiralty rules.  *See Kohlasch v. New York State Thruway Auth.*, 460 F.

12   Supp. 956, 962 (S.D.N.Y. 1978) (allegations that "drain" constructed by transit authority causing

13   polluting "discharge" into navigable water supported admiralty jurisdiction); *see also*

14   *United States v. City of Redwood City*, 640 F.2d 963, 969 (9th Cir. 1981) (collecting cases where

15   "[o]il pollution in navigable waters constitutes a "maritime tort"); *see* NOR ¶ 22 (collecting

16   cases).  In short, maritime pollution—which the State unquestionably alleges here—is a *maritime*

17   *tort*, and maritime torts exemplify traditional maritime activity.  That satisfies the "substantial

18   relationship" test.

19        The State does not dispute that marine pollution is a maritime tort that substantially relates

20   to traditional maritime activity.  Dkt. 19 at 9.  Instead, it leads with a non sequitur, reciting an

21   irrelevant definition of "maritime transaction" from an entirely different statute.  *Id*. (quoting 9

22   U.S.C. § 1).  The State makes no attempt whatsoever to connect that definition to the issue here.

23   When the State returns to the relevant question, it claims that the maritime pollution cases that

24   have found maritime jurisdiction are all about "oil spills," where the relevant activity were the

25   "spills themselves."  *Id.* at 10.  Not so.  Those cases are not limited to "oil spills"; they include

26   jurisdiction based on other types of "discharge" (pollution) into navigable waters.  *Kohlasch*, 460

27   F. Supp. at 962 (pollution from land-based "drain construct[ion]").  That is precisely what the

28   State alleges here: that ExxonMobil has caused the discharge of pollution (namely, plastic) into

- 12 -

1    navigable waters.

2    The State also argues that ExxonMobil's conduct "do[es] not relate to any traditional

3    maritime activity." Dkt. 19 at 9.  The State points to the "Complaint's allegations that

4    ExxonMobil engaged in deception regarding plastic recycling in California." *Id.*  But that

5    characterization frames the inquiry too narrowly, focusing selectively on just parts of the State's

6    pleading.  *Tobar*, 639 F.3d at 1198 (requiring allegations to be construed "broadly").  The

7    Complaint alleges not only deception, but also water pollution—indeed, the State brought a claim

8    explicitly titled "Water Pollution," Compl. ¶¶ 449-54, based on a statute making it "unlawful to

9    deposit in, permit to pass into, or place where it can pass into the waters … [a]ny substance or

10   material deleterious to fish, plant life, mammals, or bird life."  Cal. Fish & Game Code

11   § 5650(a)(6).  Maritime plastic pollution constitutes a traditional maritime tort, regardless of any

12   additional allegations about "deception."[23]  Maritime jurisdiction therefore supports removal.

13   **2.     Federal Question Jurisdiction Under the Federal Enclave Doctrine**

14   "Federal courts have federal question jurisdiction over tort claims that arise on 'federal

15   enclaves.'"  *Durham*, 445 F.3d at 1250.  A "federal enclave" is land acquired by the federal

16   government from a state under Article I, section 8, clause 17 of the U.S. Constitution.  *City &*

17   *Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1111 (9th Cir. 2022).  Examples include

18   "numerous military bases, federal facilities, and even some national forests and parks."  *Allison v.*

19   *Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1235 (10th Cir. 2012); *Azhocar v. Coastal Marine*

20   *Servs., Inc.*, 2013 WL 2177784, at *1 (S.D. Cal. May 20, 2013) (same).  Once an enclave is

21   created, "federal law governs" there, which means "there is federal jurisdiction if the claim's

22   locus is in a federal enclave."  *Honolulu*, 39 F.4th at 1111.

23   The federal-enclave locus test is satisfied by claims that either (a) "allege that an *injury*

24

25   [23] As the State acknowledges, the Complaint also alleges that ExxonMobil's over-production of
     plastic polymers has impacted plastic waste shipping to China, harm to "boat navigation," and
26   ocean plastic "gyres."  NOR ¶¶ 23-24; Dkt. 19 at 10 n.2.  The State's only response is to fall back
     on its artful disclaimer of "federal injuries," *see* Compl. at p. 7 n.1.  But "federal injuries" are not
27   an element of maritime jurisdiction, and the State's artful disclaimer is ineffective in any event.
     *See infra* at 15.
28

- 13 -

1    *occurred* on a federal enclave" or (b) "that an injury stemmed from *conduct* on a federal enclave."

2    *Id.*  The locus test is satisfied as long as "at least some of the[] locations" where the tortious harm

3    occurred are "federal enclaves."  *Bell v. Arvin Meritor, Inc.*, 2012 WL 1110001, at *2 (N.D. Cal.

4    Apr. 2, 2012); *see also Durham*, 445 F.3d at 1250 (the fact that "some of Durham's claims arose

5    on federal enclaves" would support jurisdiction).[24]

6           Here, the locus of the pollution-related harms the State alleges includes California's

7    "waterways"—oceans, rivers, lakes, and bays—and their "*shorelines*."  Compl. ¶ 60.  This

8    encompasses numerous marine and land-based federal enclaves from Northern to Southern

9    California: the Presidio in San Francisco, Camp Pendleton, the Golden Gate National Recreation

10   Area, and Monterey Bay National Marine Sanctuary, Compl. ¶ 360, to name a few examples.

11   *Totah v. Bies*, 2011 WL 1324471, at *2 (N.D. Cal. Apr. 6, 2011) (Presidio is a federal enclave);

12   *Jamil v. Workforce Res., LLC*, 2018 WL 2298119, at *4 (S.D. Cal. May 21, 2018) (same for

13   Camp Pendleton); *Azhocar*, 2013 WL 2177784, at *1 ("[Federal] enclaves include 'numerous

14   military bases'").  Based on the State's allegations of shoreline plastic pollution, "*at least some* of

15   the[] locations" where the injuries from "plastic waste and pollution crisis" occurred are federal

16   enclaves, including those listed above.[25]  *Bell*, 2012 WL 1110001, at *2; Compl. ¶ 1 & *passim*;

17   Dkt. 19 at 13.  In other words, the alleged injuries the State seeks to redress include "injury [that]

18   *occurred* on a federal enclave" (as well as other sites in California).  *Honolulu*, 39 F.4th at 1111.

19          The State makes three arguments against federal enclave jurisdiction, none of which has

20   merit.  First, the State relies on *Honolulu* and *San Mateo*, but those cases addressed totally

21   different theories based on the locus of defendants' conduct, not the locus of the alleged harm.

22   Start with *Honolulu*: The defendants there contended that the locus of their alleged *conduct*—"oil

23   and gas operations"—"occurred on federal enclaves," but the Court held that conduct was "too

---

24   [24] Again, as long as one claim satisfies the federal-enclave locus test, that suffices to support
25   jurisdiction over the entire action.  *Allapattah*, 545 U.S. at 563; *see supra* note 20.

26   [25] Of course, California's shorelines do not fall "exclusively under the ownership or control of the
     federal government."  Dkt. 19 at 12.  That is why ExxonMobil does not argue the entire coast is a
27   federal enclave.  But the State cannot dispute that the shorelines where the alleged injuries
     occurred contain federal enclaves.  *Totah*, 2011 WL 1324471, at *2; *Jamil*, 2018 WL 2298119, at
28   *4.  That more than suffices for jurisdiction.

1   remote and attenuated from [the States'] injuries" to support federal enclave jurisdiction.  39

2   F.4th at 1111-12.  In *San Mateo*, the defendants likewise asserted jurisdiction based on their own

3   prior conduct on federal enclaves.  *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 750 (9th

4   Cir. 2022) ("[T]hey contend that Standard Oil Co. … operated Elk Hills Naval Petroleum

5   Reserve, a federal enclave, for many decades, and CITGO distributed gasoline and diesel under

6   its contracts with the government to multiple naval installations that are federal enclaves.").  But

7   unlike *Honolulu* and *San Mateo*, where defendants invoked jurisdiction based on "*conduct*,"

8   ExxonMobil here invokes jurisdiction because the alleged *injury* occurred on federal enclaves—

9   an alternative basis for enclave jurisdiction approved by both cases.  *Honolulu*, 39 F.4th at 1111;

10   *San Mateo*, 32 F.4th at 750.

11        Second, the State again invokes footnote 1 of the Complaint, *see supra* note 23, which

12   seeks to preemptively avoid the federal-jurisdictional consequences of pleading liability for

13   "global" plastic-pollution problems by disclaiming any injuries arising on federal lands.  Compl.

14   at p. 7 n.1; Dkt. 19 at 11-12.  The State omits that the remaining 470+ paragraphs of the

15   Complaint plead claims for harms that inevitably occurred on federal enclaves.  Just as "the artful

16   pleading rule" precludes attempts to "defeat removal by omitting to plead necessary federal

17   questions in a complaint," *ARCO Env't Remediation, L.L.C. v. Dep't of Health and Env't Quality*

18   *of Montana*, 213 F.3d 1108, 1114 (9th Cir. 2000), so too should this Court reject the State's

19   "artful" footnote disclaiming the federal-enclave jurisdiction inherent in global "marine plastic

20   pollution" claims.  *See, e.g.,* Compl. ¶ 380.  A mere "[f]ailure to indicate the federal enclave

21   status and location of the [harm] will not shield plaintiffs from the consequences of this federal

22   enclave status," *Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992), and the State

23   cannot negate Section 1331's "intent … to provide a broad jurisdictional grant to the federal

24   courts" through strategic footnotes.  *Cf. Powell*, 395 U.S. at 515.

25        Third, the State again relies on *Earth Island* (and the out-of-circuit case it adopted, *State*

26   *of New Mexico v. Monsanto*, 454 F. Supp. 3d 1132 (D.N.M. 2020)), but those cases do not control

27   here.  The State cites *New Mexico* for the proposition that "[f]ederal enclave jurisdiction is not

28   triggered merely because federal lands are nearby or connected to the affected areas," and claims

- 15 -

1    "ExxonMobil fails to identify which (if any) … federal enclaves were allegedly harmed."  Dkt. 19

2    at 12-13.  But to the extent that *Earth Island* and *New Mexico* rejected the possibility of

3    jurisdiction based on injuries merely "adjacent to or near the enclave," *New Mexico*, 454 F. Supp.

4    3d at 1146; *Earth Island*, 521 F. Supp. 3d at 878, those cases are not relevant here, because the

5    injuries that the State alleges are not merely "adjacent" to federal enclaves.  Instead, the State's

6    allegations of plastic pollution, reaching "every corner of the globe," "proliferating in oceans,

7    seas, rivers and lakes, accumulating at or near the surface, on lake and ocean bottoms, and along

8    riverbanks and shorelines," Compl. ¶ 60, inexorably include harms occurring *directly on* the

9    shoreline enclaves (the Presidio and Camp Pendleton, for example) and marine enclaves

10   (Monterey Bay National Marine Sanctuary) identified in the Notice of Removal.  NOR ¶ 29;

11   *Totah*, 2011 WL 1324471, at *2 (Presidio); *Azhocar*, 2013 WL 2177784, at *1 (military bases).[26]

12        The State does not actually dispute that, as a logical matter, its allegations of shoreline

13   plastic pollution inherently include "harm actually ar[ising]" on federal enclaves.  Dkt. 19 at 12.

14   To the extent *Earth Island* and *New Mexico* held that the alleged injury's "*partial occurrence* on a

15   federal enclave is insufficient to invoke federal jurisdiction," *New Mexico*, 454 F. Supp. 3d at

16   1146, they are inconsistent with *Durham*, *Bell*, and *Honolulu*'s injury-based locus test.  *Compare*

17   *id.*, *and Earth Island*, 521 F. Supp. 3d at 879, *with Durham*, 445 F.3d at 1250 ("some of

18   *Durham*'s claims arose on federal enclaves"), *and Bell*, 2012 WL 1110001, at *2 ("at least some

19   of the[] locations" are "federal enclaves.").  No Ninth Circuit authority supports the State's novel

20   theory—seemingly based on a misquote from *Honolulu*—that jurisdiction requires that the State's

21   alleged injury "'occur exclusively in a federal enclave.'"  Dkt. 19 at 11.  The Complaint's

22   allegations of plastic-pollution injuries on some federal enclaves support removal.

23

24

---

25   [26] To the extent the State is attempting to assert a "lack[] [of] factual evidence of harm occurring
     on federal enclaves" as a basis for remand, Dkt. 19 at 12, its argument fails because the State has
26   not supported that factual challenge with any countervailing evidence of its own.  *See Jones v. LA
     Cent. Plaza LLC*, 74 F.4th 1053, 1056 n.1 (9th Cir. 2023); *Leite v. Crane Co.*, 749 F.3d 1117,
27   1122 (9th Cir. 2014); *infra* at 17-18.  Indeed, the only possible conclusion from the Complaint's
28   allegations is that the harm of plastic pollution occurred in part on shoreline federal enclaves.

1

**B.      Section 1442(a)(1) Authorizes Federal-Officer Removal**

2          The State's claims are also removable under the federal officer removal statute, which

3   provides for removal of an action against "any officer (or any person acting under that officer) of

4   the United States or of any agency thereof … for or relating to any act under color of such

5   office."  28 U.S.C. § 1442(a)(1).  Federal-officer removal is construed "broadly in favor of

6   removal," providing rights "much broader than those under section 1441" because it is "so

7   important to the federal government to protect federal officers."  *Durham*, 445 F.3d at 1252-53;

8   *Leite*, 749 F.3d at 1122.   Removal is proper so long as: (1) ExxonMobil was "'acting under'

9   federal officers," (2) it "can assert a colorable federal defense," and (3) the State asserts claims

10  "for or relating to" ExxonMobil's actions under federal direction.  *Honolulu*, 39 F.4th at 1106.

11  Courts give Section 1442's elements a "generous interpretation" to protect its "policy favoring

12  removal" against "frustrat[ion] by a narrow, grudging interpretation."  *Durham*, 445 F.3d at 1252;

13  *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981).  Accordingly, the State's contention that

14  ExxonMobil must overcome a "strong presumption" against federal-officer removal, Dkt. 19 at

15  16 (quoting *Hansen v. Group Health Cooperative*, 902 F.3d 1051, 1057 (9th Cir. 2018) (a § 1441

16  case)), is precisely backwards, as the "presumption against removal in ordinary diversity

17  jurisdiction cases does not extend" to Section 1442, *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014

18  (7th Cir. 2018).

19          Considering these principles, ExxonMobil easily satisfies all three Section 1442

20  requirements.  NOR ¶¶ 38-64 (acting under); *id.* ¶¶ 75-82 (colorable defense); *id.* ¶¶ 36-37, 65-74

21  (causal nexus).  The State raises two categories of challenges to federal-officer removal:

22  evidentiary challenges and legal ones.  Its arguments fail across the board.

23          **1.      The State's Evidentiary Arguments Fail to Negate Jurisdiction**

24          The State argues that ExxonMobil "provides insufficient evidence" to invoke federal-

25  officer removal.  Dkt. 19 at 15.  But "[n]othing in 28 U.S.C. § 1446 requires a removing

26  defendant to attach evidence of the federal court's jurisdiction to its notice of removal."  *Janis v.*

27  *Health Net, Inc.*, 472 F. App'x 533, 534 (9th Cir. 2012).  A removing defendant bears no

28  evidentiary burden of production unless and until the plaintiff first mounts a "factual attack"

- 17 -

1    against that defendant's jurisdictional allegations. *Leite*, 749 F.3d at 1121. A cognizable "factual

2    attack," moreover, requires more than mere protestations of insufficient evidence; rather, a

3    plaintiff must "challenge the rationality, or the factual basis, of [defendant's] assertions," *Salter v.*

4    *Quality Carriers, Inc.*, 974 F.3d 959, 964 (9th Cir. 2020), "usually by introducing evidence

5    outside the pleadings" to "contest[] the truth" of defendant's allegations, *Leite*, 749 F.3d at 1121.

6         Here, the State's purported evidentiary challenge boils down to the contention that

7    ExxonMobil did not "support [its assertion] with competent proof." *See id.* at 1122 (no

8    cognizable factual attack); *see* Dkt. 19 at 15-16 (arguing "insufficient evidence" because

9    ExxonMobil does not "provide any evidence" of federal direction and has not "include[d] any

10    such contract"). That contention alone is insufficient to mount a factual challenge. *Salter*, 974

11    F.3d at 964. And notably, the State "did not offer any declaration or evidence that challenged the

12    factual bases of [ExxonMobil's] plausible allegations"; "has not challenged any of

13    [ExxonMobil's]  essential assumptions or shown that any one was unreasonable"; and ultimately,

14    "has not really challenged the truth of [ExxonMobil's] 'plausible allegations.'" *Id.* at 964-65.

15    ExxonMobil has presented more than sufficient evidence to support "reasonable assumptions"

16    that its Section 1442(a) allegations are "plausible." *Id.*; Dkt. 1-1, Exs. 2-11 (federal government's

17    wartime synthetic rubber expansion), Ex. 12 (contract with Humble Oil, as "agent" of Defense

18    Plant Corporation ("DPC"), to "assist" with government-owned butyl plant), Exs. 13-16

19    (authorization requests to the federal government for repairs). Absent a cognizable factual

20    counterattack by the State—which is lacking here—nothing more is required.[27]

21         If the State had "raised a factual attack on [ExxonMobil's] jurisdictional allegations," it

22    would not matter. *Leite*, 749 F.3d at 1122. ExxonMobil still has the opportunity now to "support

---

23    [27] There is also no reason, *contra* Dkt. 19 at 15, to doubt that the entities in question were

24    "predecessors to ExxonMobil." *See Exxon Mobil Corp. v. United States*, 2020 WL 5573048, at

     *2 (S.D. Tex. Sept. 16, 2020); *see also id.*, No. 4:10-cv-02386 (S.D. Tex. Sept. 30, 2013), Dkt.

25    103-2 at ¶ 9 ("Exxon is the successor-in-interest of Humble Oil & Refining Company

     ("Humble"), Standard Oil Company of Louisiana ("Standard"), and Standard Oil Company of

26    New Jersey ("Standard NJ").").  And courts routinely permit federal-officer removal based on

     predecessor entities' conduct. *See, e.g.*, *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 809 (3d Cir.

27    2016); *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1178 (7th Cir. 2012); *Honolulu*, 39 F.4th at 1109;

28    *Baker v. Atlantic Richfield Co.*, 962 F.3d 937, 942-43 (7th Cir. 2020).

1  its allegations with competent proof." *Id.*  And it has done so here, submitting examples of the

2  WWII-era contracts between federal government agencies and Humble Oil and Standard Oil that

3  the State says are absent.[28]

4      **2.      The State's Legal Attacks on Each Element Fail**

5          **a.      ExxonMobil Acted Under Federal Direction**

6          ExxonMobil satisfies the "acting under" requirement because its production of synthetic

7  rubber for military use during World War II occurred under federal direction.  "For a private

8  entity to be 'acting under' a federal officer, the private entity must be involved in 'an effort to

9  assist, or to help carry out, the duties or tasks of the federal superior'" under federal "subjection,

10  guidance, or control." *Goncalves By and Through Goncalves v. Rady Children's Hospital San*

11  *Diego*, 865 F.3d 1237, 1245 (9th Cir. 2017).  "Acting under" thereby "covers situations … where

12  the federal government uses a private corporation to achieve an end it would have otherwise used

13  its own agents to complete." *Ruppel*, 701 F.3d at 1181 (e.g., "assisting the federal government in

14  building warships").

15          As a matter of law, a "private party acts under the government when the party is a

16  contractor given detailed specifications and ongoing supervision to help fight a war." *Honolulu*,

17  39 F.4th at 1107; *see also Isaacson v. Dow Chemical Co.*, 517 F.3d 129, 136-37 (2d Cir. 2008)

18  (defendants acted under federal officer by "contract[ing] with the Government to provide a

19  product that the Government was using during war—a product that, in the absence of Defendants,

20  the Government would have had to produce itself"); *Baker*, 962 F.3d at 942-43 (similar).  That

21  was ExxonMobil's role in World War II.  It worked at the direction of federal officers to help the

22  "Government, under the stress of a war emergency," to "transform[] [synthetic rubber] into a full-

23  blown industry" in "the short span of 3 years."  Dkt. 1-1, Ex. 4 at 1.  To do so, ExxonMobil

24  operated federally owned plants to produce synthetic rubber to government-dictated

25  specifications, subject to government oversight and approval, and under day-to-day "[o]perational

26

27

28  [28] *See* Exs. L-R (contracts); Exs. S-W (leases).

- 19 -

1    supervision" and control of the federal government.[29]  That epitomizes "acting under" conduct.

2    *Ruppel*, 701 F.3d at 1181; *Isaacson*, 517 F.3d at 136-37.

3         The State's attempts to dispute ExxonMobil's "acting under" relationship all fail.  First,

4    the State suggests that *San Mateo* and *Honolulu* "already soundly rejected [ExxonMobil's]

5    arguments." Dkt. 19 at 14; *see also id.* at 17.  These cases addressed totally unrelated factual

6    allegations about past "oil and gas" activities.  *San Mateo*, 32 F.4th at 759; *Honolulu*, 39 F.4th at

7    1108.  They did not consider, much less reject, whether ExxonMobil "acted under" federal

8    direction in developing the synthetic rubber industry during World War II.

9         Second, still relying on *San Mateo* and *Honolulu*, the State contends ExxonMobil engaged

10   in a "normal commercial or regulatory relationship," Dkt. 19 at 14, which does not amount to

11   "acting under" for purposes of federal officer removal.  *Id.* at 17.  But unlike *San Mateo* and

12   *Honolulu*, this case involves wartime rubber-industry conduct by ExxonMobil that bears none of

13   the hallmarks of a mere "arm's-length business arrangement with the federal government."

14   *Honolulu*, 39 F.4th at 1109 (considering mere federal regulatory compliance, paying for offshore

15   oil leases, and "coordinat[ing] … use of [an] oil reserve" owned 80% by government and 20% by

16   company to "benefit both parties"); *San Mateo*, 32 F.4th at 759–60 (similar).[30]  Contrary to the

17   State's argument, Humble Oil and Standard Oil were not mere "lessees" subject to "basic

18   government directives."  Dkt. 19 at 18.  Unlike *San Mateo* and *Honolulu*, this case does not

19

20   [29] Ex. X at 349 ("Operational supervision of the plants was carried on by another RFC subsidiary,
     Rubber Reserve Company."); *see also* NOR ¶ 64; *id.* ¶¶ 38-63; Ex. L at 1-2 (preamble and § 1),

21   17-18 (§ 12), 28-35; Ex. M at 1-2 (preamble and § 1), 18 (§ 13), 24-30; Ex. N at 1-2 (preamble

22   and § 1), 4 (§ 4), 13-17; Ex. O at 1-2 (preamble and § 1), 16 (§ 13), 24-33; Ex. P at 1-2 (preamble
     and § 1), 18 (§ 13), 27-32; Ex. Q at 1-3 (preamble and § 1), 23 (§ 13), 32-41 (contract requiring

23   production to specific governmental specifications; predecessors as "agent" of DPC); Ex. R at 1-3
     (preamble and § 1), 14 (§ 13) (similar); *see also* Ex. S at 1-2 (¶¶ 2-3) (lease making

24   ExxonMobil's predecessor "agent" of DPC and requiring DPC approval over "plans, designs,
     specifications" for plants); Ex. T at 1-2 (¶¶ 2-3) (similar); Ex. U at 3-4 (¶¶ 3-4) (similar); Ex. V at

25   3-4 (¶¶ 3-4) (similar); Ex. W at 1-3 (¶¶ 2-3) (similar); Dkt. 1-1, Ex. 12 at 1-2 (¶¶ 2-3) (similar).

26   [30] The State mischaracterizes *Cabalce*, which does not say an indemnification clause or
     independent-contractor status negates the "acting under" element.  *Cabalce v. Thomas E.*

27   *Blanchard & Assocs., Inc.*, 797 F.3d 720, 729 (9th Cir. 2015) (recognizing that "[i]ndependent

28   contractors may be afforded the benefits of federal officer removal").

involve companies merely paying the government to lease government property. Instead, the DPC acquired sites specifically for the construction or conversion of plants for synthetic-rubber production; maintained "[t]itle to the site, buildings, machinery, and equipment" acquired to operate the plants; and leased them to Humble Oil and Standard Oil for "the sum of One Dollar ($1) per year" (while paying or reimbursing operating costs, including for preparation of process designs, employee salaries, subcontractor expenses, materials, insurance premiums, and more).[31] In short, ExxonMobil "contracted with the Government to provide a product that the Government was using during war" and could not "produce itself." *Isaacson*, 517 F.3d at 136-37. And its actions "at the request" of the federal Rubber Reserve Corporation, NOR ¶ 49, helped solve the "most critical problem" of "a large new rubber supply [for] our war effort and our domestic economy." *Id.* ¶ 45; Dkt. 1-1, Ex. 9 at 23; *see also* Dkt. 1-1, Ex. 4 at 21 (expansion of butadiene capacity), Ex. 8 at 47 ("operations were of unprecedented size").

Next, the State contends the requisite federal "control" is missing, claiming the government's role was limited "to basic contractual oversight and involvement" in ExxonMobil's production. Dkt. 19 at 18-19 (citing *San Mateo*, 32 F.4th at 757). Again, the facts here are nothing like *San Mateo* and *Honolulu*, where the federal government's role was limited to "telling Defendants how to comply" with federal "regulations," or "decisions like approving certain actions on a well or giving specific waivers to excuse compliance with regulations"; instead, ExxonMobil has provided evidence here that the government was "directing or supervising operations generally." *Honolulu*, 39 F.4th at 1109. Federal agencies controlled and maintained day-to-day "[o]perational supervision of the plants" they owned at ExxonMobil's facilities, Ex. X at 349, including exercising "authority to oversee the operation of synthetic-rubber plants," NOR ¶ 61 (citing *Exxon Mobil Corp.*, 2020 WL 5573048, at *6, *14), approving or denying requests to make necessary improvements to facilities, *id.* ¶ 63, and controlling "access to the raw materials"

---

[31] Dkt. 1-1, Ex. 12 at 2-4 (¶¶ 5, 7, 10); Ex. S at 2-4 (¶¶ 5, 7, 10) (reimbursement of "all direct expenses"), 4 (¶ 7) ("site, buildings, machinery and equipment"); *see also* Ex. T at 3-4 (¶¶ 5, 7, 10) (similar); Ex. U at 2, 5 (¶¶ 1, 8, 11) (similar); Ex. V at 4-6 (¶¶ 7, 9, 12) (similar); Ex. W at 3-4 (¶¶ 5,7 10) (similar).

used in the plants.  *Id.* ¶ 62; Dkt. 1-1, Exs. 13-16 (governmental authority to approve or deny requests at facilities).[32]  At least one plant had an onsite government official, who "played a substantial role in overseeing day-to-day operations."  NOR ¶ 63 (citing *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486, 531 (S.D. Tex. 2015)).  And the relevant federal-government contracts and leases repeatedly recognized Humble Oil and Standard Oil as "[a]gent[s]" of the DPC;[33] dictated precise "procedure[s]" and "specifications" for those entities to follow in producing butyl and butadiene;[34] guaranteed the DPC's right to inspect the sites, equipment, records regarding operations, and accounting records at "all reasonable times" or "during business hours";[35] and prohibited Humble Oil and Standard Oil, "without the prior written consent of [DPC]," from using the "site[s], buildings, and machinery" that were the subjects of the leases and contracts "for any purpose except for the manufacture of [synthetic rubber] under the terms of [their] contract[s]" with the federal government.[36]

The government's role extended far beyond merely reviewing regulatory compliance.  *Cf. Honolulu*, 39 F.4th at 1109.

### b.    ExxonMobil Raises a Colorable Federal Contractor Defense

To satisfy Section 1442's second requirement, defendants need only allege a "colorable"

---

[32] ExxonMobil agrees that the *Exxon Mobil* case is not "issue preclus[ive]."  Dkt. 19 at 19 n.7.  But its factual findings underscore the plausibility of ExxonMobil's jurisdictional allegations, and the State introduces no contrary evidence.  Courts can take judicial notice of the existence of (though not the truth of) another court's decision, including the fact of the court's "findings."  *California Sportfishing Prot. All. v. Shiloh Grp., LLC*, 268 F. Supp. 3d 1029, 1038 (N.D. Cal. 2017).

[33] Ex. L at 2; Ex. M at 2; Ex. O at 2; Ex. P at 2; Ex. Q at 1; Ex. R at 2; Ex. S at 2 (¶ 3); Ex. T at 2 (¶ 3); Ex. U at 3 (¶ 4); Ex. V at 3 (¶ 4); Ex. W at 2 (¶ 3); Dkt. 1-1, Ex. 12 at 2 (¶ 3).

[34]  Ex. L at 2 (§ 1), 28-32; Ex. O at 2 (§ 1), 24-28; Ex. N at 2 (§ 1), 13-17; Ex. Q at 2 (§ 1), 32-36; *see also* Ex. M at 2 (§ 1), 24; Ex. P at 2 (§ 1), 27-30; Ex. R at 2-3 (§ 1).

[35] Dkt. 1-1, Ex. 12 at 8 (¶ 20); Ex. S at 8 (¶ 20); Ex. T at 7 (¶ 20); Ex. U at 9 (¶ 21); Ex. V at 11 (¶ 22); Ex. W at 8 (¶ 20); Ex. L at 14 (§ 5); Ex. M at 12 (§ 5); Ex. P at 14 (§ 5); Ex. Q at 18 (§ 5); Ex. R at 9 (§ 5).

[36] Ex. T at 7 (¶ 19) (regarding Standard Oil's production of butadiene); *see also* Ex. V at 10 (¶ 21) (similar); Ex. U at 8-9 (¶ 20) (similar for Standard Oil's production of butyl); Ex. W at 8 (¶ 19) (similar for butadiene catalyst); Ex. S at 7 (¶ 16) (similar for Humble's production of butadiene); Dkt. 1-1, Ex. 12 at 7 (¶ 16) (similar, for butyl).

1    federal defense—a "bar [that] is not high," as "Defendants need not win their case before

2    removal." *Jackson v. Avondale Indus. Inc.*, 469 F. Supp. 3d 689, 703 (E.D. La. 2020); *Stirling v.*

3    *Minasian*, 955 F.3d 795, 801 (9th Cir. 2020); *Ruppel*, 701 F.3d at 1182 (colorable means

4    plausible).  Here, ExxonMobil raises a colorable federal contractor defense.  This defense applies

5    where: "(1) the United States approved reasonably precise specifications; (2) the equipment

6    conformed to those specifications; and (3) the supplier warned the United States about the

7    dangers in the use of the equipment that were known to the supplier but not to the United States"

8    (if any).  *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988).

9        For the first and second prongs, "all that the defense requires" is that the "product

10    supplied for government use … conformed to the government's 'reasonably precise

11    specifications.'"  *Baker*, 962 F.3d at 946.  That does not necessarily mean adherence to a specific

12    production recipe; the test is satisfied where "[a] defendant [can] show 'a continuous exchange

13    and back and forth dialogue between the contractor and the government,' that amounts to 'more

14    than a cursory rubber stamp.'"  *Pizarro v. Astra Flooring Co.*, 444 F. Supp. 3d 1146, 1151-52

15    (N.D. Cal. 2020); *Betzner*, 910 F.3d at 1016 ("detailed and ongoing direction and control"

16    suffices); *Machnik v. Buffalo Pumps Inc.*, 506 F. Supp. 2d 99, 103 (D. Conn. 2007) (similar).

17        ExxonMobil's wartime synthetic rubber production satisfies the reasonably precise

18    specifications test.  The government contractually required Humble and Standard Oil to comply

19    with highly detailed specifications for producing butadiene, butyl, and a catalyst used in the

20    manufacture of butadiene, including requirements for final-product "purity," and specific

21    procedures and calculations for performing the requisite chemical reactions.[37]  There is no

22    question that the government found ExxonMobil's butadiene and butyl production acceptable.

23    *See* NOR ¶¶ 43, 54-56, 59; Dkt. 1-1, Ex. 2 at 51, Ex. 4 at 21.  Indeed, the relevant contracts

24    indicate that all accepted shipments of butadiene and butyl are "conclusively deemed to have met

25

26

_____

27    [37] Ex. L at 2 (§ 1), 28-32; Ex. O at 2 (§ 1), 24-28; Ex. N at 2 (§ 1), 13-17; Ex. Q at 2 (§ 1), 32-36;
      *see also* Ex. M at 2 (§ 1), 24 (providing for "specification[s]" and "recipe"); Ex. P at 2 (§ 1), 27-

28    30 (same); Ex. R at 2-3 (§ 1) (referencing specifications on file with RRC).

1   Contract Specifications."[38]  Nor does any record evidence suggest mere governmental "rubber

2   stamp[ing]" of ExxonMobil's output.  *Cf. Pizarro*, 444 F. Supp. 3d at 1151-52.  On the contrary,

3   the government closely supervised and controlled production.  *See supra* at 19-21.

4       On prong three, a defendant need only warn of dangers "known to the [defendant] but ***not***

5   to the United States."  *Boyle*, 487 U.S. at 512.  Where the government has equivalent knowledge,

6   or no danger was known to the contractor at all, no warning is required.  *See, e.g.*, *Leite*, 749 F.3d

7   at 1123-24.  Here, nothing suggests that ExxonMobil knew any more than the federal

8   government, even if there were some (unidentified) inherent danger to synthetic rubber.  Nor does

9   the State argue otherwise.  In fact, the State's only argument against the federal contractor

10  defense is the supposed lack of "applicable contract[s]."  Dkt. 19 at 21.  That argument

11  misunderstands the applicable evidentiary burdens, and ExxonMobil has submitted applicable

12  contracts in any event, *see supra* at 17-19.

13              **c.**    **ExxonMobil's Acts Under Federal Direction Relate to the**
                          **State's Claims**
14

15      ExxonMobil's wartime production of synthetic rubber is also sufficiently related to the

16  State's plastic-pollution claims to permit removal.  The so-called "causal nexus" element

17  represents a "quite low" bar, requiring only that "the acts complained of *'relate to'* acts taken

18  under color of federal office."  *Goncalves*, 865 F.3d at 1244; *In re Commonwealth's Motion to*

19  *Appoint Counsel*, 790 F.3d 457, 472 (3d Cir. 2015).  "In assessing whether a causal nexus exists,

20  [courts] credit the defendant's theory of the case."  *Leite*, 749 F.3d at 1124.

21      The State contends its claims exclusively "stem from ExxonMobil's [alleged] deceptions

22  regarding the feasibility of plastic recycling," which occurred after its wartime rubber production.

23  Dkt. 19 at 23.  But the State's claims also arise from the alleged "global … plastic waste and

24  pollution crisis."  Compl. ¶ 1; *see id.* ¶¶ 2-6.  The millions of tons of synthetic rubber that

25  ExxonMobil helped produce at the direction of the federal government contributed to—and thus

26  "relate to"—this alleged pollution crisis.  NOR ¶ 67; *see also id.* ¶ 51; Dkt. 1-1, Ex. 2 at 51.  The

27  ――――――――――――――――
    [38] Ex. L at 17-18 (§ 12); Ex. O at 16 (§ 13); Ex. N at 4 (§ 4); Ex. Q at 23 (§ 13); Ex. M at 16
28  (§ 13); Ex. P at 18 (§ 13); Ex. R at 14 (§ 13).

1   butyl and butadiene produced by Humble Oil and Standard Oil were used to make tires and other

2   critical wartime equipment, including for use throughout California.  NOR ¶¶ 69-71.  As the State

3   concedes, Dkt. 19 at 23, the Complaint critiques ExxonMobil's advanced recycling process,

4   expressly referencing "waste tires," which are used as feedstock for the process.  Compl. ¶¶ 267,

5   271 n.125; NOR ¶ 72.  Additionally, the Complaint repeatedly emphasizes ExxonMobil's alleged

6   impact on the plastic pollution crisis as the "largest" producer of "plastic that becomes plastic

7   waste in California."  Compl. ¶ 2; *see also id.* ¶¶ 4-5, 59, 80, 239.  If that is true, it is only because

8   ExxonMobil ascended to industry leadership following its "joint efforts" with the government to

9   exponentially grow the synthetic-rubber industry during World War II.  NOR ¶ 43, Ex. 4 at 1.

10       The State next argues that ExxonMobil's synthetic-rubber production in World War II is

11  too far removed from modern pollution.  Dkt. 19 at 22.  *Baker* rejects that temporal attenuation

12  argument.  There, the fact that the "bulk of the [c]ompanies' operations occurred outside [the]

13  wartime period" did not matter, as long as "*at least some of the pollution* arose from the federal

14  acts:"  "[N]o support [exists] in the statute or precedent for [a] rule that a removing defendant

15  must operate under government orders for most of the relevant time frame."  *Baker*, 962 F.3d at

16  943-45.  Here, too, ExxonMobil has plausibly alleged that at least some of the pollution arose

17  from federal acts during World War II.  And, of course, the State seeks to require ExxonMobil to

18  clean up *all* plastic pollution, including plastic produced under federal direction.

19  **V.**    **<u>CONCLUSION</u>**

20       For the foregoing reasons, and those set forth in ExxonMobil's Notice of Removal, the

21  Court should deny the motion to remand.

22

23

24

25

26

27

28

DEFENDANT'S OPPOSITION TO MOTION TO REMAND
CASE NO. 3:24-CV-07594-RS

1

2    Dated:  January 9, 2025                          O'MELVENY & MYERS LLP

3

4                                                     By:    */s/ Dawn Sestito*
                                                            Dawn Sestito

5                                                     DAWN SESTITO (S.B. #214011)
6                                                     MATTHEW R. COWAN (S.B. #281114)
                                                      O'MELVENY & MYERS LLP
7                                                     400 South Hope Street, 18th Floor
                                                      Los Angeles, CA 90071-2899
8                                                     United States
                                                      Telephone:    (213) 430-6000
9                                                     Facsimile:    (213) 430-6407
                                                      dsestito@omm.com
10                                                    mcowan@omm.com

11                                                    DAVID J. LENDER (*pro hac vice*
                                                      *forthcoming*)
12                                                    david.lender@weil.com
                                                      WEIL, GOTSHAL & MANGES LLP
13                                                    767 Fifth Avenue
                                                      New York, New York 10153-0119
14                                                    Telephone:    (212) 310-8153
                                                      Facsimile:    (212) 310-8007

15                                                    *Counsel for Defendant*

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S OPPOSITION TO MOTION TO REMAND
CASE NO. 3:24-CV-07594-RS